**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff,**

v.

**A.M. and Patsy DELOACH and 43 related cases (Barrick Jacksonville Limited Partnership, Case Nos. 86 Civ. 2272, 2284, 2285, 7206, 7207, 7208, 7209, 7210, 7211, 7212, 7213, 7214, 7215, 7216, 7217, 7218, 7219, 7220, 7221, 7222, 7223, 7224, 7229, 7244, 7245, 7246, 7247, 7248, 7249, 7250, 7251, 7252, 7253, 7254, 7255, 7256, 7257, 7332, 7504, 7506, 7507, 7529, 8546), Defendants.**

Nos. 86 Civ. 2271 (LLS), 86 Civ. 2272, 86 Civ. 2284, 86 Civ. 2285, 86 Civ. 7206—86 Civ. 7224, 86 Civ. 7229, 86 Civ. 7244—86 Civ. 7257, 86 Civ. 7332, 86 Civ. 7504, 86 Civ. 7506, 86 Civ. 7507, 86 Civ. 7529 and 86 Civ. 8546.

United States District Court,
S.D. New York.

Feb. 25, 1989.

D'Amato & Lynch, New York City (Richard F. Russell, Lloyd J. Herman, Gerald J. Carroll, Jr., of counsel), for plaintiff.

Robert A. Goldschlag, Freehold, N.J., for defendants Dolores and Erich Tappert.

Drinker Biddle & Reath, New York City (J. Portis Hicks, Jane R. Coleman, Gregg J. Borri, of counsel), for all other defendants.

## OPINION AND ORDER

STANTON, District Judge.

These 44 cases[1], consolidated for purposes of discovery and the within motions, concern investments defendants made in a tax shelter limited partnership. National Union Fire Insurance Company of Pittsburgh ("National Union"), an issuer of financial guarantee bonds, sues to enforce its indemnity agreements with limited partners in the limited partnership, and to enforce its rights as subrogee on the limited partners' promissory notes which it honored on their behalf. National Union issued bonds which guaranteed, to the partnership and to the banks that financed the partnership, that the limited partners would make all of the capital contributions represented by their notes. The defendant limited partners stopped making their required contributions, and National Union paid on their behalf. Now it sues defendants for reimbursement, under the indemnity agreements, and as subrogee on the promissory notes on which defendants defaulted.

Two motions are decided in this opinion. One is National Union's motion under Fed. R.Civ.P. 56 for summary judgment dismissing[2] the counterclaims of eight defendants (the "counterclaiming defendants")[3] alleging violations of the federal securities laws, fraud, negligence, and breaches of plaintiff's alleged duties of good faith and fair dealing, and fiduciary duty. The other is a motion by twenty-nine defendants[4] under Fed.R.Civ.P. 14, for leave to file a third-party complaint. Because, as defendants' surety, National Union only owed defendants a duty to cure their defaults rather than a duty to disclose to them any information it might have had about the limited partnership, National Union's motion for dismissal of the counterclaims is granted, and defendants' motion for leave to bring in third parties is denied.

## BACKGROUND

### The Project

In late 1983 each defendant received a Confidential Private Placement Memorandum ("CPPM") concerning the Barrick Jacksonville Limited Partnership ("BJLP"). (CPPM, Exhibit 1 to affidavit of Gregg J. Borri, sworn to June 1, 1987) BJLP was organized, and the CPPM was prepared, by Leslie R. Barth and three affiliated entities: Landmark Acquisitions, Inc. (a Connecticut corporation of which Barth was the president and director), The Barrick Group, Inc. (a Connecticut corporation of which Barth was the president, director, and treasurer), and Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C. (a law firm of which Barth was a partner) (the "law firm") (collectively "the Group").[5] The

1. Over 400 such cases are currently before this court in which National Union sues for reimbursement of payments it made on behalf of investors in various similar limited partnerships.

2. By Order dated December 18, 1987 this court converted plaintiff's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) to a motion for summary judgment.

3. These are defendants Feder, Keelan, Koneru, Munns, O'Callaghan, O'Donnell, Siron, and Tappert (Case Nos. 86 Civ. 7214, 7223, 7213, 7210, 7224, 7245, 7248, and 7249).

4. These are defendants Aaron, Anthony, Armbuster, Briggs, Sr., Briggs, Jr., Brewer, Byung Ho Chang, Connor, Cussan, Feder, Gross, Keelan, Klingbell, Koneru, Leighton, Munns, O'Cal-

laghan, O'Donnell, Ottenad, Parillo, Shuter, Siron, Steward, Tappert, Triplett, Wagner, Wittgen, Williams, and Wolf (Case Nos. 86 Civ. 7257, 7256, 7255, 7218, 7219, 7222, 7259, 7216, 7215, 7214, 7206, 7223, 7244, 7213, 7332, 7210, 7224, 7245, 7246, 7507, 7247, 7248, 7506, 7249, 7252, 7504, 7253, 7229, and 7254).

5. The CPPM uses the term "the Group" to refer to "the General Partner and its affiliates," and states that the affiliates include Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C., The Barrick Group, Inc., North American Investment Resources, Inc., and Barrick Property Management, Inc. (CPPM, p. 22)

CPPM identified Landmark Acquisitions, Inc. as the general partner of BJLP, and The Barrick Group, Inc. as "the Seller." (CPPM, p. 2) Although the CPPM's list of participants included the general partner, the seller, the banking liaison, tax counsel, and the property manager, National Union does not appear among the participants. *Id.*

BJLP's purpose was to sell limited partnership interests in order to raise money to "acquire, own and operate an office building and attached parking garage located in Jacksonville, Florida, currently undergoing rehabilitation (the 'Project')." *Id.* at i, 28–30. The CPPM stated that "It is anticipated that [the Project] will be 100 percent completed by March 31, 1984," *id.* at 12, but it did not specify a date by which the building would be acquired. The anticipated returns to the limited partners included income tax deductions as well as payments from leasing space in the building.

Each investor was encouraged to "consult his own counsel and accountant as to legal, tax and other related matters concerning his investment" before deciding whether to participate in BJLP. *Id.* at iii.

### Financing for the Project

Financing for the Project was to come from two sources: sales of limited partnership interests totalling $3,996,000, and a mortgage to be obtained. *Id.* at 2, 20. Investors could pay for their limited partnership interests in cash, whether borrowed or their own. *Id.* at 9. Or, as did all the defendants, investors could make initial cash down payments, and sign promissory notes (the "Notes") for the balance of the purchase price of the limited partnership interests. *Id.* at 8–9.

In accordance with the CPPM's provision in the Summary, *id.* at 3,[6] that

the General Partner may pledge, assign, or negotiate the Notes to a financial institution in connection with financing for the acquisition of the Project,

the Group assigned forty Notes to the J. Henry Schroder Bank & Trust Company in May 1984 and another twelve Notes to the Bank of New York (collectively "the banks") in August 1984 as collateral for loans the banks made to BJLP. To induce the banks to make the loans and accept assignment of the Notes, the Group needed, and asked, National Union to supply bonds which guaranteed payment by the limited partners of their Notes. National Union, in its turn, required the limited partners to execute indemnity agreements whereby they agreed to reimburse National Union for any payments it made on the Notes on their behalf. In addition, the limited partners pledged their interests in BJLP as security for their obligations to National Union under the indemnity agreements.

In accordance with instructions, defendants sent their installment payments on the Notes to the Group, which was to forward[7] these payments to the banks.

### The Defaults

As early as September 21, 1984 the Group wrote to some defendants, informing them that "interest on the outstanding balance of your capital contribution is now due" and instructing each to send a check payable to BJLP to the banks. (Exhibit A, affidavit of Robert W. O'Donnell, sworn to Mar. 2, 1988) Shortly thereafter the banks notified National Union that many of the BJLP limited partners had defaulted on their first payments. National Union wrote the limited partners and requested they cure their defaults.[8] Those limited partners eventually made the payments.

---

**6.** This provision is also stated in the same language in the section "Payments by the Investors" (p. 9) and in substantially identical language in the section "Financing Risks," (p. 15):

The Partnership anticipates obtaining a portion of the funds required in order to pay the fees and expenses in connection with acquiring the Project and this Offering by obtaining a loan from a commercial bank se-

cured by Limited Partner Notes and the surety bonds and letters of credit.

**7.** The time was to come when the Group defrauded defendants by keeping their payments instead of forwarding the money to the banks—who, not receiving it, notified National Union of the defaults which National Union made good, thus leading to this litigation.

**8.** The letter stated in part:

National Union, however, continued to receive default notices from the banks during the fall of 1984. It cured the defaults by paying the banks, and was reimbursed by the Group in November 1984.

### Rescissions and "Redirections" of the Limited Partners Obligations

By letter dated December 13, 1984 Mr. Barth advised defendants that much was amiss with BJLP:

> [A]s a result of repeated delays caused by numerous breaches by the Sellers of the existing contract between Barrick and ACM Investors, Inc. (the Sellers of the Jacksonville Project), it has become clear to Barrick that to proceed with the construction of the Project would be both economically unfeasible, and because of the excessive time delays, would be in no way in conformity with the revised schedules projected in our previous correspondence to the Limited Partners. Therefore, we have elected to cancel the Project, have commenced suit against the Sellers on behalf of the Partnership for breach of contract, and offer the Limited Partners two alternative investments in place of recission [sic]. (Letter dated December 13, 1984 from Leslie Barth to Dr. and Mrs. O'Donnell, Exhibit F to affidavit of Robert W. O'Donnell, sworn to Mar. 2, 1988).

The letter further stated that the alternative investments "present an element of certainty that was not in the Jacksonville Project." Mr. Barth also assured the limited partners that they were "entitled to a full recission [sic]." *Id.*

Most defendants elected rescission, signed rescission agreements which by their terms extinguished their obligations

> National Union is Surety on a Financial Guarantee Bond for this Limited Partnership and, on which Bond, you are one of the Principals.
>
> We have been formally placed on notice that your payment on your note due September 1, 1984 is in default.
>
> . . . . .
>
> If the default is not cured by November 29, 1984, National Union will make payment in accordance with the terms of the Bond. National Union will then proceed against you under the terms of the Indemnification and

on their Notes, and stopped making payments. The Group returned their original cash down payments, as well as the principal and interest payments they had made. It also promised to return their Notes to them, but never did so.

The seven counterclaiming defendants opted for the alternative investments and signed a "Redirection of Investment Agreement." These defendants continued to send checks payable to BJLP to the Group in satisfaction of their obligations on the new investment. National Union was not a party to, and did not receive copies of, the redirection agreements. Nor did it receive a copy of Mr. Barth's December 13, 1984 letter.

### The Settlement

At a meeting held on April 3, 1985 Mr. Steve Sion of the Barrick Group informed those at National Union assigned to BJLP that there were problems with the Project, that the Group had commenced litigation, and that some limited partners wished to redirect their investments into another Group partnership while others wished to rescind their obligations.

Raymond McDaniel, one of National Union's employees, took the following handwritten notes at the meeting:

> Project is *not* 50% leased-up.
>
> This allows rescission to L.P.'s & 80% wants that.
>
> Q: Escrow of funds until 50% lease-up? What happened to this?
>
> –Investors have rt. of rescission—this works if Notes held in escrow, but not with notes held by Bank. Rt. to rescind w/o *ability* to rescind because HDC [holder in due course] of note.

> Pledge Agreement signed by you on December 23, 1983. In addition to foreclosure on your partnership interest, this will include loss, costs, damages, fees of attorneys and other expenses which National Union may sustain or incur in connection with the bond. (Exhibit D to affidavit of Robert W. O'Donnell, sworn to Mar. 2, 1988)

Since defendants submitted nearly identical affidavits in opposition to National Union's motion, citations will be made only to Mr. O'Donnell's affidavit.

–Proposal: Barrick to take over place of investors; make note payments.

? Why ?

NUF [National Union] will be viewed as having *knowledge* of rescission problem vs. HDC problem because we 1) read book & 2) issued Bond on Notes held by bank, *not* in escrow.

*Problems*

—going forward w/ work-out:

1) We are in deep w/ Barrick—if this deal tanks, Barrick might be BR [bankrupt] if we pursue them as we have rt. [right] to do—dominoe [sic] effect on other Bonded deals.

2) Constructively forced to do business w/ them in future.

Following the April 3, 1985 meeting, National Union expressed an interest in discussing BJLP's problems directly with Mr. Barth, and met with him on July 12, 1985. A "memorandum to file" dated June 11, 1985 (Exhibit 20 of Defendant Munns Exhibits, Exhibits to the supplemental affidavit of Richard F. Russell, Volume Three), written by Bill Sidford of National Union's parent company, provides a "Financial Analysis of Barrick Group, Inc. and Leslie R. Barth." Based only on the Barrick Group's February 24, 1984 balance sheet (it states "we did not receive financial statements from years prior making a trend analysis unobtainable"), Mr. Sidford concluded that:

Barrick may be riding the trade and that the company may be experiencing cash flow problems. It is the writer's opinion that Barrick's financial position is weak and their ability to assume additional debt without corresponding debt receivables or to supply cash flow for a deal in trouble is limited.

Barrick Group, Inc. has offered to substitute themselves for those investors who have chosen to exercise their right of recision [sic] from Barrick Jacksonville, L.P., Bond # 117 69. This offer is one that under normal circumstances NUFIC would not entertain. Barrick's ability to support such an obligation or its present obligations is questionable. The risk of default is high. However,

faced with no other alternative substitute investors, Barrick Group should be accepted as a substitute investor....

It is the writer's opinion that Leslie Barth would be a superior substitute investor to the Barrick Group, Inc. ...

At the end of August 1985 Mr. Barth agreed to designate the law firm "to be the substitute limited partner and maker of the promissory notes." (National Union Memorandum dated August 27, 1985, Exhibit 24 to affidavit of Gregg J. Borri, sworn to June 1, 1987) Negotiations continued during the fall of 1985.

By January 17, 1986, however, National Union wrote defendants about the default notices it had received from the banks throughout 1985:

Normally, we would have contacted you after the first default, however, in this instance we were assured by the "Barrick Group" that they were going to satisfy your obligation. Unfortunately this has not materialized, and by contacting you now, we are giving you the opportunity to reimburse us for the outstanding balance prior to referring this matter to legal counsel. (Letter dated January 17, 1986 from National Union to Mr. Garry W. Williams, Exhibit 40 of Exhibits to the Supplemental Affidavit of Richard F. Russell, Volume Three)

National Union sent copies of these letters to the Group.

In February 1986 National Union and the "law firm" signed an agreement, pursuant to which the law firm paid National Union $400,000 as a partial settlement. National Union sent another letter to defendants in April 1986, notifying them of the agreement and advising them that it would not enforce its rights under the indemnity agreements as long as the law firm met its obligations. (Letter dated April 16, 1986 from National Union to Mr. Marcus Aaron, Exhibit N of Exhibits to the supplemental affidavit of Richard F. Russell, Volume Two)

### Litigation

The law firm, however, failed to comply with the agreement, and National Union

commenced suit against most of the defendants in September 1986.[9]

In June 1987 most of the defendants, as well as five other limited partners who are not defendants in these actions, filed a complaint against Leslie R. Barth and the Group, *Aaron, et al. v. Leslie R. Barth, The Barrick Group, Inc., Landmark Acquisitions, Inc., and Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C.,* 87 Civ. 4052 (KMW). That complaint alleges that those defendants committed common law fraud, violated the federal securities laws and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1982 & Supp. IV 1986) ("RICO"), and breached their fiduciary duty to the limited partners. The proposed third party complaint which the twenty-nine defendants in the present actions seek leave to file consists of allegations nearly identical to those in the *Aaron* suit.

### The Counterclaims

The counterclaiming defendants argue that National Union aided and abetted the Group's violation of the federal securities laws by

> reviewing and approving of the representations in the CPPM; causing the Indemnity Agreement to be delivered with the CPPM; participating in the assignment of the surety bonds and investor notes to a bank in return for unrestricted cash loans to BJLP in a manner blatantly contrary to the representations made in the CPPM; intentionally deviating from its own internal underwriting procedures and disregarding negative information about Barth in order to accomplish the deal and collect its fee; waiving the requirement that the partnership acquire title to the Project; failing to reveal any of plaintiff's extensive knowledge (including the fact that Barth had not abided by the escrow requirements) to the limited partners; and failing to inform

defendants of the alleged defaults on the Notes while negotiating a deal with Barth to protect this financial interest in the other Barrick Group partnerships. (Defendants' June 9, 1987 Memorandum, p. 35)[10]

Further, the counterclaiming defendants contend that by late 1984 National Union knew that eighty percent of the BJLP investors were in default on the Notes, and yet did not inform them that it was making payments on their behalf to the banks. Had National Union done so, defendants contend, it would have learned that they had sent their checks to the Group which kept the money instead of forwarding it to the banks. Unaware of their "defaults," defendants continued sending checks to the Group, and National Union, fearful of a "domino" effect on other Group partnerships for which it had acted as surety, did not alert defendants to the Group's wrongdoing. Defendants also claim that National Union engaged in fraud and deceit, joined in the Group's breach of a fiduciary duty, breached its duty to perform the indemnity agreements in good faith, and acted negligently.

### Synopsis

Underlying these assertions are the concepts that National Union's research of BJLP before underwriting[11] the limited partners' contributions and its participation in other Group partnerships required National Union to advise the limited partners of any material information it discovered, and that because National Union did not adhere to a number of its own internal underwriting guidelines, it facilitated and is responsible for the Group's fraud perpetrated upon defendants.

■ Defendants' assumption that they were entitled to rely on National Union's actions and its status as a surety of their Notes rests on the mistaken premise that

---

**9.** National Union brought suit against four defendants in March 1986.

**10.** In total, nine memoranda were filed in connection with these two motions. For convenience in reference, they are identified by the date they were filed.

**11.** It should be noted, to avoid confusion, that National Union uses the term "underwriting" in its insurance sense as guaranteeing the continuation of the limited partners' payments, not in the usage of the securities law with respect to the distribution of an issue of securities.

National Union owed them a duty to disclose. Unfortunately for defendants, National Union did not undertake to furnish them the solicitude or protection which they may have expected. Rather, National Union merely agreed to cure the limited partners' defaults should they occur. *See In re McNeil*, 22 B.R. 408, 413 (E.D.Tenn. 1982) (surety " 'undertakes to pay money or to do any other act in event that his principal fails therein' " and does not owe a duty to "disclose all material facts solely within its possession") (quoting Black's Law Dictionary 753–54 (4th ed. 1951)); *accord Rhode Island Hospital Trust National Bank v. Ohio Casualty Insurance*, 613 F.Supp. 1197 (R.I.1985).

National Union had an interest in investigating the partnerships to avoid becoming obligated to a stream of future payments if limited partners should default, an event which would most likely occur only if the enterprise failed and the limited partners abandoned it. The research efforts National Union expended were solely for its own purposes; it assumed no obligation to inform others of BJLP's merits or infirmities. If defendants drew the conclusion that the investment would prosper from National Union's guarantee of their own promises to pay, they did so at their own risk. That conclusion may have seemed reasonable enough, but National Union owed them no duty either to investigate BJLP or to make disclosures about the investment.

## DISCUSSION

Under Fed.R.Civ.P. 56(c) the moving party on a summary judgment motion bears the burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Where, as in these cases, the non-movants bear the ultimate burden of proof at trial, they may defeat the motion by establishing the existence of evidence sufficient to raise issues of fact material to the essential elements of the claim. *Id.* 106 S.Ct. at 2553. The court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion."

*Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). However, the non-movants may not rest upon conclusory allegations or denials to defeat the motion, but rather must provide "concrete particulars" in the form of supporting facts or arguments in opposition. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

## I. Agency

Defendants contend that the Group acted as National Union's agent in two respects: (1) in marketing and selling the partnership interests (by distributing and securing the completion of the indemnity agreements and questionnaires relating to the financial condition of each investor, as well as obtaining additional financial information "when requested to do so by National Union") (Defendants' March 3, 1988 Memorandum, p. 6; Defendants' Statement Pursuant to Local Rule 3(g), ¶ 3)), and (2) in seeking National Union's review and "approval" of the CPPM. (Defendants' June 9, 1987 Memorandum, p. 8–9).

It is basic to an agency relationship "that the agent acts subject to the principal's direction and control." *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984) (citation omitted); *accord Kyung Sup Ahn v. Rooney, Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985) ("element of subservience is essential"; no agency relationship where alleged principal lacks right to control alleged agent). To the extent that BJLP personnel obtained the investors' signatures to National Union's agreement forms and collected premiums for forwarding to National Union, these actions on National Union's behalf in no way altered the essential nature of the parties' relationships and roles in the transactions. Even viewing the Group as having National Union's authority to obtain the investors' signatures and collect the premiums, there is no basis for supposing that the Group was its agent or under its control in the Group's actions in connection with marketing or selling the limited part-

nership interests. There is no basis for holding National Union responsible to defendants for the Group's actions in that connection. *National Union Fire Ins. Co. of Pittsburgh v. Turtur,* [Current] Fed.Sec. L.Rep. (CCH) ¶ 93,979 at 90,568, 1988 WL 87297 (S.D.N.Y. Aug. 10, 1988); *Schlifke v. Seafirst Corp.,* [1987] Fed.Sec.L.Rep. (CCH) ¶ 93,107 at 95,443, 1987 WL 4718 (N.D.Ill.1987) (the investors did not adduce facts to show that the bank knew of the alleged misrepresentations made to them by the venture's salesmen in soliciting their investments).

■ With respect to their second assertion defendants cite paragraph 8 of National Union's form "indication letter" ("The Company shall have received and given final approval to the subscription agreement, offeree questionnaire and private placement memorandum.") (Exhibit 6 of Defendant Munns Exhibits, Exhibits to the supplemental affidavit of Richard F. Russell, Volume Three), and a letter dated April 19, 1983 from the law firm to National Union with respect to another Group partnership:

> I am enclosing the final draft of the Barrick Ralston Limited Partnership private placement memorandum together with the closing and subscription documents for such transaction. These documents are currently being sent to a printer to put together a more attractive package. However, I would appreciate your review of the enclosures as soon as possible. Naturally, when the printer returns to us the final product, you will

receive one hot off the press! (Exhibit G to the affidavit of Gregg J. Borri, sworn to Feb. 29, 1988)

Defendants, however, have not offered evidence of insertions, deletions, or alterations National Union made to the CPPM. Without such evidence, they have not raised an issue of material fact sufficient to defeat a motion for summary judgment. There is nothing to indicate that National Union controlled or affected the CPPM.

## II. First Counterclaim

Defendants' first counterclaim alleges that National Union aided and abetted the Group's violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) and Rule 10b–5 promulgated thereunder [12] in connection with the original sale of partnership units.

■ To establish aiding and abetting liability under the federal securities laws, defendants must prove three elements: a securities law violation by the primary party (the "primary violation"); scienter on the part of the aider and abettor; and substantial assistance by the aider and abettor in the primary violation. *IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *accord Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 280, *on rehearing,* 602 F.Supp. 837 (S.D.N.Y.1985).

The primary violation consists of a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, reliance upon the misrepre-

---

12. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1982).

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1986).

sentation or omission to one's detriment, and scienter in making the misrepresentation or omission. *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 502 (S.D.N.Y.1987).

Defendants contend that based upon statements made in the CPPM, it was reasonable for them to believe that (1) the initial cash payments as well as the Notes would be held in escrow until BJLP acquired and leased fifty percent of the Project, (2) they could rescind if the Project was not acquired and fifty percent leased within one year, (3) the Notes would be assigned or pledged only to fund the purchase of the Project, (4) National Union's role was to secure each defendant against any other defendant's default, and that, in the event of any defaults, each would be secured by the value of the Project.

National Union takes issue with defendants' contentions in two respects. First, "the alleged misrepresentations in the PPM about which defendants complain are statements with respect to events that were to take place, if at all, in the future—*i.e.,* promises or projections." (Plaintiff's March 18, 1988 Memorandum, p. 27) Thus to prove fraud, defendants must establish that the Group had no intentions of fulfilling those promises and that National Union knew of the Group's intentions. (Plaintiff's June 16, 1987 Memorandum, p. 13) Second, National Union argues that "defendants posit an interpretation of the PPM that strains credulity to the breaking point," (Plaintiff's March 18, 1988 Memorandum, p. 27), because the CPPM stated that the Notes might be negotiated to a bank and that only the cash purchase price ($1,675,000 out of $3,996,000 in limited partners' capital contributions) was to be held in escrow, and did not identify a closing date, and that the relevant provisions of the CPPM stated provided only that should a limited partner default, he or she would be liable to National Union.

Even assuming a primary violation, however, National Union's liability as an aider and abettor turns on the second and third requirements.

Case law adjusts the required degree of the aider's scienter and assistance to the primary violation according to whether the aider owed a duty of disclosure to the defrauded party. If the aider owes such a duty, recklessness suffices to establish scienter. *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) (recklessness is " 'highly unreasonable' " conduct representing " 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the [aider] or so obvious that [the aider] must have been aware of it.' ") (quoting *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977)), *cert. denied sub nom. Blyth, Eastman Dillon & Co. v. Rolf,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *accord Hudson v. Capital Management International, Inc.,* 565 F.Supp. 615, 624 (N.D.Cal. 1983) ("recklessness will suffice for secondary liability where defendant is under a special duty to disclose based on insider status or a fiduciary or similar relationship"). But if the aider does not owe such a duty, it is not liable unless it had actual knowledge of the fraud and an intent to aid and abet the wrongful act. *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3rd Cir.) ("Knowledge of the underlying violation is a critical element"; "mere unknowing participation in another's violation is an improper predicate to liability"), *cert. denied sub nom. First Pennsylvania Bank, N.A. v. Monsen,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975) (when no "duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.") (citations and footnote omitted). In addition, if the alleged aider engaged only in transactions which were routine to its business, it is less likely to have acted with the requisite scienter. *Id.* ("If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of

intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"). *Accord Securities and Exchange Commission v. Washington Co. Utility District*, 676 F.2d 218, 226 (6th Cir.1982); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 504 (reasonable to infer knowledge and intent from allegations of "participation in atypical financing transactions and the sale, at a discount, of promissory notes among defendants").

■ Of significance here is that where the alleged substantial assistance consists of a failure to act, courts are hesitant to hold the aider liable absent a duty to act. *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) ("if the aider and abettor owes the plaintiff an independent duty to act or to disclose, inaction can be a proper basis for liability under the substantial assistance test"), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). *See also Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983) (inaction "ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act.") (citation omitted); *IIT v. Cornfeld*, 619 F.2d at 927 ("Apart from a case [where inaction advances the fraud and the aider had a strong motive not to act because the fraud was benefitting him] inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act"; accountant "had no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared"); *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. 175, 179 (N.D.Ill.1986) ("nondisclosure does not provide the 'substantial assistance' requisite to Rule 10b–5 aiding and abetting liability without some special duty"); *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d at 800 ("mere knowledge of a violation alone, without assistance or a duty to disclose the violation, is not an actionable wrong"); *Securities and Exchange Commission v. National Student Marketing Corp.*, 457 F.Supp. 682, 713 (D.D.C.1978).

■ Defendants appear to suggest that because National Union had certain underwriting guidelines, and "approved" the CPPM, the fruits of National Union's investigation of BJLP should have been furnished to them. As discussed above, regardless of any actions National Union may have taken or guidelines it may have followed in assessing its own risks in guaranteeing the Notes, its duty to defendants is defined by its agreements with them, the bonds and indemnity agreements. As their surety, National Union guaranteed that those investors who elected to buy partnership interests by signing the Notes rather than paying cash would make the required payments on their Notes and that if they did not, National Union would make the payments on their behalf. Unless National Union misled defendants by its own actions, it is not responsible for the defendants' understandings of the investment.

Comparing cases holding that the alleged aider owed and breached a duty with cases holding there was no duty breached demonstrates that National Union's review of the CPPM for its own purposes did not require it to disclose any information to defendants. On the one hand are *Securities and Exchange Commission v. Washington Co. Utility District*, 676 F.2d at 224 (manager of public utility district had duty to disclose kickback from underwriter of bond); *Edward J. Mawod & Co. v. Securities and Exchange Commission*, 591 F.2d 588, 596 (10th Cir.1979) ("where brokers are obligated to investigate, the failure to do so subjects them to a holding that they acted wilfully") (citation omitted); *Klein v. Computer Devices*, 591 F.Supp. at 280 (duty breached where aider "participated in the preparation and review of the allegedly defective prospectus and ... actively promoted the sale of shares ... by, for example, orchestrating the entire transaction, placing advertisements and processing purchase orders"); *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793 (holding bank liable for making loan to company

and then demanding continuation of program in which employees, without any financial information, traded salary for unregistered subordinated promissory notes); *Morgan v. Prudential Group, Inc.*, 527 F.Supp. at 961 (S.D.N.Y.1981) (counsel who prepares tax opinion for prospectus has duty to investors); *Securities and Exchange Commission v. National Student Marketing Corp.*, 457 F.Supp. 682 (merging corporation's president and counsel had duty to disclose altered financial data to shareholders). On the other hand are *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. 175 (bank which made loan to investor in limited partnership and made separate loan to limited partnership did not have duty to inform investor of cross-default provision which allowed bank to accelerate due date on investor's loan and draw upon investor's collateral in event limited partnership defaulted on its loan); *Quintel Corp., N.V. v. Citibank, N.A.*, 589 F.Supp. 1235 (S.D.N.Y. 1984) (dismissing complaint against limited partnership's attorney who remained silent in order to assist general partner's scheme to defraud); *Hudson v. Capital Management International, Inc.*, 565 F.Supp. at 623 (accountant, attorney and underwriters, who did not possess inside information or knowingly participate in a fraudulent scheme, had no duty to disclose information in limited partnership prospectus); *Schlifke v. Seafirst Corp.*, [1987] Fed.Sec. L.Rep. (CCH) ¶ 93,107, at 95,443 ("even if [the investors] could establish that [the aider] had knowledge of material misrepresentations or omissions by [the primary violator], since [the aider] had no independent duty to assure that [the primary violator] properly transmitted all relevant information to the investors, the alleged 'nondisclosures' by [the aider] do not provide the 'substantial assistance' requisite to an aiding and abetting claim"); *In re Gap Stores Securities Litigation*, 457 F.Supp. 1135 (N.D.Cal.1978) (vice president who reviewed defective prospectus and failed to take action owed only the duty not to misrepresent facts in portion of prospectus he prepared); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 549 (S.D.N.Y.1977) ("mere possession of adverse financial information

regarding a public company does not require independent auditor to disclose it").

■ Lacking a duty to disclose, National Union is not liable for aiding and abetting the primary violation unless it is shown to have known of the alleged misstatements or omissions in the CPPM and to have had a "conscious and a specific motivation for not acting." *IIT v. Cornfeld*, 619 F.2d at 927; *accord Wright v. Schock*, 571 F.Supp. 642, 663 (N.D.Cal. 1983) ("Missing here is any evidence that the banks and title companies sought some benefit to themselves from the consummation of [the] alleged fraud, which might convert silence and inaction into substantial assistance"), *aff'd*, 742 F.2d 541 (9th Cir. 1984).

Defendants assert that the handwritten notes of the April 3, 1985 meeting and National Union's approval of the representations in the CPPM show that it knew of the primary violation. Because of National Union's own investigation, the law firm's May 1984 and August 1984 opinion letters (which omitted to represent that BJLP had title to the property), and the early defaults by limited partners, defendants argue that National Union was aware that "the Barrick Group was not prepared to live up to these representations." (Defendants' June 9, 1987 Memorandum, p. 32)

■ Notes from a meeting held well over a year after defendants invested in BJLP do not establish that National Union knew of any misstatements in the CPPM before the meeting. *Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957 (after-the-fact internal memoranda demonstrating counsel's concern whether prospectuses were defective do not establish that counsel knew of the defect at the time of sale). The same is true for the opinion letters provided to National Union approximately six months after the limited partners purchased their interests. As for National Union's compliance, or lack thereof, with its own underwriting guidelines, any precautions it undertook were not on defendants' behalf, and any it waived were not to their detriment, because it had no duty to disclose information to them.

As motives for not acting, defendants argue that National Union "railroaded the deal through in order to earn its fee" and feared "a 'domino effect' on other [Group] deals." (Defendants' March 3, 1988 Memorandum, p. 18, 21) Neither assertion, however, makes sense. With respect to pursuing a fee National Union received only 1.4% of the dollar amount of each Note it guaranteed,[13] but in doing so committed itself to paying the entire amount of each Note and interest payments thereon—over $2.5 million in liability. As for defendants' assertion that the handwritten notes from the April 3, 1985 meeting show National Union's fear that exposing the Group's purported fraud in the BJLP partnership would have a deleterious effect on other Group partnerships for which National Union had issued bonds, such fears could not have been a motive to participate in the sale of partnership interests which occurred in early 1984.

As is apparent from the above discussion and notwithstanding defendants' Local Rule 3(g) Statement of Disputed Material Issues of Fact ("3(g) Statement"), no facts material to the outcome of this motion are in dispute.[14] "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

Defendants make twenty assertions in their 3(g) Statement. Assertions 1, 2, 12, and 14 are not disputed. Assertion 3 (the Group acted as National Union's agent) is a mixed question of fact and law as to which the facts are assumed in defendants' favor and the remaining question of law is ruled on above. Assertion 19 states a question of law since it is taken for granted that but for National Union's active participation and its issuance of the bonds, defendants'

Notes could not have been negotiated to the banks. However, "[a]llegations of a 'but for' causal relationship are insufficient" for aiding and abetting liability. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir.1985) (citation omitted). Assertions 4 and 5, reciting statements in the CPPM, are not material because National Union did not prepare and was not responsible for the CPPM. And because National Union did not have a duty to disclose information about BJLP, assertions 6, 7, 8, 9, 13, 15, and 18 also are not material. Assertions 10 and 11, which fault National Union for its failure to follow its own underwriting procedures, have no bearing on its relationship with defendants. Assertions 16 and 17 are merely suppositions of what defendants might have done in other circumstances. And assertion 20 (that one defendant did not sign his indemnity agreement) might only be material if National Union were moving for summary judgment on its complaint.

Last, defendants urge this court to deny National Union's motion because they "have not been furnished a substantial amount of discovery to which they are entitled." (Defendants' March 3, 1988 Memorandum, p. 31–32) Specifically, defendants contend that (1) they "should be permitted to cross-examine Mr. McDaniel at trial before the trier of fact in order to find out what Mr. McDaniel's notes … were meant to 'reflect,' " *id.* at 21–22, and (2) they have received few documents from the Barrick Group, "Mr. Barth has refused to answer questions at his deposition, asserting the Fifth Amendment privilege against self incrimination" and that, therefore, "adverse inferences … should be drawn against National Union by reason of its agent Barth's refusal to testify." *Id.* at 33.

---

**13.** Since the face amount of each Note was $69,000 and National Union received 1.4%, its fee per Note would be $966.

**14.** By letter dated June 9, 1988 counsel for defendants suggest that an opinion by the Honorable Vincent L. Broderick in *National Union v. George Thomas*, No. 86 Civ. 2272 (LLS), —— F.Supp. —— (S.D.N.Y. June 6, 1988), in part

denying National Union's motion for summary judgment on its complaint "collaterally estops National Union from contending that there are no material issues of fact requiring trial" in these actions. However, as counsel concedes, "Judge Broderick did not have before him much of the evidence submitted" with respect to these cases.

Unlike the cases on which defendants rely, discovery in these cases has been anything but sparse and defendants have had ample time to conduct discovery. *See Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506 at 511–12 (2d Cir.1989) ("trial court may properly deny further discovery if the nonmoving party has had a fully adequate opportunity for discovery" where it "proffered no persuasive basis for the district court to conclude that further discovery would yield" asserted evidence). In the deposition of Mr. McDaniel defendants questioned him at great length about the April 3, 1985 meeting. They must now raise more than a mere hope that cross-examination at trial will reveal facts helpful to their counterclaims. As for Mr. Barth's testimony, National Union is not responsible for his decision to take the Fifth Amendment. In addition, defendants have not taken the depositions of other Group employees or shown why their testimony might not be as informative as Mr. Barth's.

Defendants' first counterclaim, therefore, is dismissed.

### III. Second Counterclaim

Defendant's second counterclaim asserts that National Union also aided and abetted the Group's violations of Section 10(b) and Rule 10b–5 with respect to the rescissions and redirections of defendants' investments. (Amended Answer and Counterclaims, ¶ 66–73)

As the primary violation by the Group, defendants allege two misstatements—that defendants' agreements to purchase an interest in BJLP had been rescinded and thus they had no further liability thereon and that defendants should continue to make payments to BJLP to meet their obligations to the redirected investment—and two omissions—that the Group had assigned the Notes to the banks and that National Union would take the position that defendants remained liable on the Notes and indemnity agreements.

Again, assuming that these allegations satisfy the first requirement of aiding and abetting liability, defendants have not established the second and third requirements. Concerning the misstatements, unrefuted evidence from National Union employees shows that they were not aware of the rescissions until April 1985, and never received copies of the rescission agreements and correspondence pertaining thereto. Consequently, National Union could not have knowingly aided and abetted the primary violation. Since National Union had no duty to defendants to disclose any information about BJLP, it is not liable for defendants' ignorance of the Notes being assigned to the banks. Finally, defendants do not point to any provision regarding their right to rescind their obligations in either the Notes or the indemnity agreements.[15] Absent such an express provision, this court cannot write one into the Notes or the agreements.

Accordingly, defendants' second counterclaim is dismissed.

### IV. Third Counterclaim

Defendants' third counterclaim alleges that National Union "knew of or recklessly disregarded the Barrick Group's misstatements, omissions and fraudulent actions and substantially participated in and materially advanced the Barrick Group's violation of Section 12(2) [of the Securities Act of 1933]." (Amended Answer, ¶ 76).

Section 12(2) provides:

Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not

---

**15.** Nor do defendants point to any provision in the Notes or indemnity agreements (or any statute or case law) which required National Union to notify defendants before it cured their defaults.

knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him.

15 U.S.C. § 77*l*(2) (1982). Although the statute would seem restricted to sellers, "the controlling law in this circuit suggests that [defendants] can sue not only their immediate sellers under section 12(2) but also those who substantially participated in the transaction. Participation can include active participation in the transaction, or aiding and abetting, or conspiring with the seller." *Klein*, 591 F.Supp. at 276 (citations omitted).

Both defendants and National Union agree that section 12(2) liability of a nonseller requires the same showing of scienter and substantial assistance as do section 10(b) and Rule 10b–5. *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 509 ("Our finding that a claim is stated for aiding and abetting liability under section 10(b) is conclusive as to the adequacy of the aiding and abetting claim under section 12.") (citation omitted) Accordingly, for the reasons stated above, defendants have failed to state a claim under section 12(2) and their third counterclaim is dismissed.

## V. Fourth Counterclaim

Defendants' remaining counterclaims arise under state law and largely mirror the federal securities law allegations.

A district court may exercise jurisdiction over pendent state claims "since the Securities Exchange Act's conferral of exclusive jurisdiction on federal courts, § 27, for violations of that act permits adjudication of all related claims only in those courts," *Weinberger v. Kendrick*, 698 F.2d 61, 76 (2d Cir.1982), *reh'g granted in part, denied in part*, Fed.Sec.L.Rep. (CCH) ¶ 99,074, *cert. denied sub nom. Lewy v. Weinberger*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

As their fourth counterclaim, defendants contend that the "Barrick Group, in concert with plaintiff, defrauded defendant[s] in connection with the sale to defendant[s] of the interest in BJLP and in connection with the rescission of defendant[s'] interest[s] in BJLP and the 'redirection' of defendant[s'] investment[s]," and fraudulently induced defendants to execute the Notes and Indemnity Agreements. (Amended Answer and Counterclaims, ¶ 80–81).

In light of this court's finding that the Group was not National Union's agent and that National Union did not owe defendants a duty to disclose, defendants' allegations of common law fraud must also be dismissed. *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 506 ("Our finding that Peat Marwick had no duty to the Abish Investors absent an affirmative representation is dispositive and mandates dismissal of … Investors' claim of common law fraud against Peat Marwick, *see, e.g., Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108, 1112 (S.D.N.Y. 1984) (common law nondisclosure is actionable provided there was fiduciary relationship or duty of disclosure arising from relationship of trust and confidence) … as well as the claim of breach of duty of care").

Thus, defendants' fourth counterclaim is dismissed.

## VI. Fifth Counterclaim

Defendants contend that National Union "joined in a breach of fiduciary duty owed to defendants by the Barrick Group, Barth and Landmark Acquisitions," (Defendants' June 9, 1987 Memorandum, p. 42), because of its "superior knowledge," "prior dealings" with the Group, review of the CPPM, "knowledge of the risks involved when the partnership does not hold the investors notes in escrow," "contractual relationship[s]" with defendants and its internal procedures. (Amended Answer and Counterclaims, ¶ 85) This argument fails for the reasons already stated in the federal securities law sections.

Defendants also allege that National Union breached its duties of good faith and

care in connection with the issuance of surety bonds. *Id.* at ¶ 86. This, however, is simply another way of asserting that National Union breached a duty it owed defendants, an assertion already found to be without merit.

## VII. Sixth Counterclaim

 The sixth counterclaim alleges that National Union breached its duty to perform the indemnity agreements in good faith.

The duty of good faith and fair dealing prohibits parties to a contract from depriving the other party of the benefits of the agreement. *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980). However, "[t]he benefits obtained by the defendants upon their execution of the Indemnity Agreements was [sic] a guarantee that each of their Notes would be paid. National Union has done nothing to deprive defendants of that benefit...." (Plaintiff's June 16, 1987 Memorandum, p. 30).

Defendants also contend that National Union acted negligently because "the risk of fraud was clearly foreseeable to plaintiff and plaintiff knew that if it did not exercise reasonable care to act in conformity with the CPPM, defendants would be subjected to a substantially increased risk of fraud." (Defendants' June 9, 1987 Memorandum, p. 45) For the reasons stated in sections I and II above, this contention must fail.

Hence, defendants' sixth counterclaim is dismissed.

## VIII. Motion to File a Third–Party Complaint

 Twenty-nine defendants seek leave pursuant to Fed.R.Civ.P. 14(a) to file a third-party complaint against Leslie Barth, The Barrick Group, Inc., Landmark Acquisitions, Inc., and Barth, Richheimer, Marvin–Smith, Friedman and Scholnick, P.C. (collectively "the Group"). The proposed third-party complaint contains eight claims: federal securities law violations (three claims), common law fraud, breach of fiduciary duty, RICO, omnibus impleader, and indemnification.

In support of their application, defendants explain that the proposed third-party complaint asserts the same facts and legal theories as the counterclaims discussed above. (Defendants' October 28, 1987 Memorandum, p. 8):

> By bringing a third-party action against the Barrick Group, defendants seek to rescind their agreements to purchase limited partnership interests in BJLP and to recover the damages that they have incurred as a result of the Barrick Group's violations of Section 12(2) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, the Barrick Group's engaging in common law fraud, breach of fiduciary duty and violation of RICO. These claims constitute the principal defenses against National Union's claims on the notes and indemnity agreements ... (*Id.* at 9)

Rule 14(a) provides that a defendant may bring in a third party "who is or may be liable to him for all or part of the plaintiff's claim against him." Both parties cite *Farmers Production Credit Assoc. of Oneonta v. Whiteman,* 100 F.R.D. 310, 312 (N.D.N.Y.1983) for the proposition that "Generally, the rule is construed as requiring that the third-party defendant's liability 'must be derivative of or secondary to that of the third-party plaintiff who is the defendant in the main action,' *Index Fund, Inc. v. Hagopian,* 417 F.Supp. 738, 744 (S.D.N.Y.1976), and must not arise out of a separate and independent claim." *Accord National Bank of Canada v. Artex Industries, Inc.,* 627 F.Supp. 610, 613 (S.D.N.Y. 1986) ("The outcome of the third-party claim must be contingent on the outcome of the main claim").

National Union's complaint states two claims: one to *enforce its rights to indemnification under the indemnity agreements,* and the other to *enforce its rights as subrogee on the Notes.* In opposition to defendants' motion it argues that their third-party claims are

> not dependent on the outcome of National Union's actions against defendants. If defendants were defrauded into purchasing interests in BJLP, or if the general partner of BJLP breached its fiduciary

duties to defendants, then they are entitled to the damages flowing from those wrongs—irrespective of any independent liability they may have to National Union. (Plaintiff's November 13, 1987 Memorandum, p. 9–10)

National Union's arguments are persuasive. In light of the disposition of National Union's motion for summary judgment dismissing defendants' counterclaims, evidence concerning the Group's primary violation is not material to National Union's claims for reimbursement. More important, derivative liability is not present here because National Union's claims are based upon the indemnity agreements and Notes, unconditional instruments to which third-party defendants were not parties and which are separate from the partnership agreements. *See National Union v. Turtur,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,765 (May 6, 1988).

Accordingly, defendants' motion for leave to file a third-party complaint is denied.

### CONCLUSION

For the foregoing reasons, National Union's motion for summary judgment dismissing the counterclaims of defendants named in footnote three of this opinion is granted, and the motion for leave to file a third-party complaint made by those defendants named in footnote four is denied.