Tina GILKS, Plaintiff,

v.

OLAY COMPANY, INC. and Proctor & Gamble Co., Defendants.

No. 97 Civ. 5687(DC).

United States District Court, S.D. New York.

Dec. 28, 1998.

Jan Hudgins Riley, New York City, for plaintiff.

Kramer, Levin, Naftalis & Frankel by Edward L. Jewett, Randall K. Packer, New York City, for defendants.

### OPINION

CHIN, District Judge.

In this diversity case, plaintiff Tina Gilks seeks damages for a severe skin reaction allegedly caused by defendants' well-known product Oil of Olay Moisture Replenishing Cream ("Oil of Olay" or the "Product"). Plaintiff asserts tort, breach of warranty, and strict liability claims against defendants Olay Company, Inc. and The Proctor & Gamble Distributing Company, incorrectly sued herein as Proctor & Gamble Co.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted and the complaint is dismissed.

### BACKGROUND

#### A. The Facts

Construed in the light most favorable to plaintiff, the facts are as follows: [1]

##### 1. Plaintiff's Use of the Product

During the last week of May 1997, plaintiff purchased a two ounce jar of Oil of Olay from a pharmacy in Manhattan. (Gilks Aff. ¶ 20). The Product's packaging did not warn of any possible negative side effects or contraindication.[2] That evening she applied the cream to her face after showering. (Id. ¶ 23).

The following morning, plaintiff showered again and reapplied the Product. (Gilks Dep. Tr. at 52). Gilks returned home from work at 1 P.M., showered, donned her bathing suit, and spent approximately the next 45 minutes sunbathing on her roof. (Id.). Plaintiff was not wearing Oil of Olay while she was in the sun. (Id. at 61–62). Plaintiff did not apply any sunscreen or other lotion before her tanning session. (Id.). When plaintiff finished sunbathing, she again showered and reapplied Oil of Olay. (Id. at 52–53). That evening, plaintiff noticed that her skin was slightly pink, "but [she] assumed it was from the sun that day." (Id. at 61).

The following morning, plaintiff showered, applied the Product, and went to work. She noticed that she was developing "little pinky spots" on her skin and "assumed maybe it was the sun." (Id. at 53). Nonetheless, after returning home, plaintiff again decided to sunbathe without applying any sunscreen or other lotion. (Id.). Gilks decided, however, not to spend as much time in the sun that day.[3] (Id.). Plaintiff again showered before

---

1. Plaintiff has failed to comply with Local Rule 56.1(b) requiring that the papers opposing a motion for summary judgment "include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." The Local Rule further provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Local Rule 56.1(c). Accordingly, the factual assertions included in defendants' Local Rule 56.1 statement must be accepted. See Vann v. New York City Transit Auth., 4 F.Supp.2d 327, 330–31 (S.D.N.Y. 1998).

2. The only instructions stated: "Smooth this rich, greaseless cream over your face and neck twice each day. Use it under makeup or alone to bring out a more youthful look."

3. Although it is unclear how much time plaintiff spent on the roof that day, it was long enough for her to have a few cigarettes and relax. (Gilks Dep. Tr. at 53).

sunbathing and was not wearing Oil of Olay while she was in the sun. (*Id.* at 61–62). When plaintiff left the roof, she took a shower and reapplied Oil of Olay. (*Id.*).

The next day, the "pinky spots" turned into "slight raised bump[s]" and "blistery-type things." (*Id.* at 61–62). That afternoon, plaintiff's co-worker, Willy Shapiro, informed plaintiff that one of the blisters on her face had popped. (*Id.* at 62). After plaintiff told Shapiro that she had been using Oil of Olay, Shapiro told plaintiff that she had had a problem with the Product some time ago and instructed plaintiff to wash the cream off of her face immediately. (*Id.* at 57, 62).

After the discussion with Shapiro, plaintiff discontinued use of the Product. (*Id.* at 57–58). Plaintiff's complexion worsened and she developed blisters that resembled "burn marks." (*Id.* at 55).

Plaintiff did not retain the sales receipt, she discarded the Product before this litigation began, and no tests were ever conducted on a sample of the cream. (*Id.* at 50–51, 73–74; Packer Aff.Ex. 4).

### 2. Medical Evidence

#### a. Dr. Donald P. Dallas

Approximately ten to fourteen days after she began using Oil of Olay, plaintiff asked the doctor who employed her, Dr. Donald P. Dallas, if he would look at her skin. (Gilks Dep. Tr. at 69–70). Dallas is a cardiologist and general practitioner, not a dermatologist. (*Id.* at 70; Pl.Mem.Ex. F at 52). Dallas cultured the blemishes and learned that plaintiff had a staphylococcus aureus infection. (Pl.Mem.Ex. F at 40). Dallas diagnosed plaintiff with pyoderma or pustular dermatitis and prescribed Augmentin, an antibiotic. (*Id.* at 41, 44). According to plaintiff, Dallas also gave her samples of two creams, Elocon and Dipolene, which she claims are used to treat burns. (Gilks Dep. Tr. at 65, 71).

Dallas assumed that plaintiff's initial irritation was caused by her use of Oil of Olay, not because he tested the Product or because he ruled out other possible causes, but because plaintiff informed him that she had recently begun using the Product. (*Id.* at 51–53). Dallas does not opine to a reasonable degree of medical certainty that plaintiff's initial irritation was caused by the Product.

Indeed, Dallas concluded that plaintiff's infection may have been caused by plaintiff scratching her skin. (*Id.* at 44–45, 50–52). The doctor testified during his deposition that plaintiff likely developed an allergic dermatitis, which was aggravated by her scratching the irritated area. (*Id.* at 50, 52, 55). In Dallas's opinion, the condition probably persisted not because of the cause of the initial irritation, but from the subsequent infection. (*Id.* at 55).

Dallas observed that the placement and distribution of plaintiff's condition were not inconsistent with a reaction to exposure to the sun. (*Id.* at 39, 53). Dallas also acknowledged that pustular dermatitis could be caused by acne. (*Id.* at 54).

#### b. Dr. Myron C. Patterson

Dallas referred plaintiff to Dr. Myron C. Patterson, a physician who shares office space with Dallas and is also a cardiologist and general practitioner. (*Id.* at 75–76). Gilks testified during her deposition that Patterson examined her a couple of times at Dallas's request to monitor her progress. (*Id.* at 75–77). Patterson testified at his deposition, however, that he had no recollection of ever examining plaintiff for a skin condition of any kind. (Packer Aff.Ex. 7 at 19).

#### c. Dr. Orit Beitner

Dr. Orit Beitner is a general practitioner who practices gynecology. (Packer Aff.Ex. 11 at 11). Beitner did not treat plaintiff for her skin condition, but has provided plaintiff with medical care for the past few years. (*Id.* at 11–13).

Beitner testified during her deposition that on May 1, 1997, approximately four weeks before plaintiff's blemishes first appeared, she injected Gilks with Depo–Provera, a form of birth control. (*Id.* at 17–20, 24). Depo–Provera remains potent for three months. (*Id.* at 20). Although Beitner did not administer any subsequent doses of the drug to

plaintiff, Beitner called in a prescription to plaintiff's pharmacy. (*Id.* at 19). Plaintiff had requested that Beitner call in the prescription so that Dallas could give her the injection. (*Id.*). Beitner testified that plaintiff called and informed her in September 1997 that Dallas had given her the second injection on August 1, 1997, three months after the first dose. During that phone call, plaintiff informed Beitner that she preferred to use birth control pills. (*Id.* at 20).

Beitner testified that Depo–Provera can cause acne and that a patient could develop an allergic rash from the drug. (*Id.* at 20–21).

#### d. *Dr. David E. Cohen*

Dr. David E. Cohen is defendants' expert.[4] (Cohen Aff. ¶ 5). Cohen's opinion with respect to plaintiff's condition was based on his examination and interview of plaintiff, his review of photographs and a videotape taken prior to his examination, his review of plaintiff's medical records, a review of pertinent medical literature, and his experience as a dermatologist. (*Id.* ¶ 7).

On March 10, 1998, Cohen examined plaintiff. (*Id.* at 5). Cohen concluded, beyond a reasonable degree of medical certainty, that the condition of plaintiff's skin was caused by neurotic excoriations. (*Id.* ¶ 6). Neurotic excoriations are symptomatic of a condition where "a patient picks at her skin, causing abrasions, deep open wounds, and, in severe cases such as this one, permanent scarring." (*Id.*). Cohen testified at his deposition that there was "no doubt in [his] mind that [plaintiff's] current injuries are entirely self-inflicted." (*Id.* ¶ 20). Cohen reached this conclusion because, as is typical of neurotic excoriations, "most of the scars and wounds appear on plaintiff's cheeks and chest, areas easily reached by her hands, and the shape and size of the scars and wounds indicate that they were formed by a scratching motion." (*Id.* ¶ 11). Further, this condition is

seen most frequently in women who are in their twenties or thirties. (*Id.* ¶ 6).

Moreover, according to Cohen, "[n]o over-the-counter face cream, Oil of Olay included, could have caused new scarring or fresh skin ulcers on [plaintiff's] face months after she stopped using the product." (*Id.* ¶ 10). Cohen testified that the videotape of Gilk's deposition taken November 27, 1997, approximately six months after plaintiff's blemishes appeared, was "particularly telling." (*Id.* ¶ 8; Packer Aff.Ex. 6). The video shows that plaintiff had fresh scars and ulcers at the time of the taping. (Cohen Aff. ¶ 10 & Ex. 6). Plaintiff's wounds at the time of Cohen's examination, approximately three and a half months after the taped deposition, nine and a half months after plaintiff used the Product, were in different places on her face and more severe than the wounds she had during her deposition. (*Id.* ¶ 9 & Ex. 2).

Cohen testified that "[t]he placement, shape, and size of [plaintiff's] scars and wounds are entirely inconsistent with injury caused by an allergic or otherwise adverse reaction to a topically applied personal hygiene product or cosmetic, such as Oil of Olay." (*Id.* ¶ 13). In Cohen's opinion, if plaintiff had had an adverse reaction to Oil of Olay, the Product would have "at worst ... caused rash-like symptoms that would have gone away shortly after [plaintiff] stopped using the product." (*Id.*).

According to Cohen, although "[i]t is possible that some blemish appeared on [plaintiff's] face and chest before she began picking her skin," he identified at least two possible causes of any such blemishes that are "far more likely explanations than is her use of Oil of Olay." (*Id.* ¶ 14).

First, in Cohen's opinion, any initial blemishes were "most likely" due to polymorphous light eruption, commonly known as sun poisoning. (*Id.* ¶ 16, 20). Cohen's conclusion is based on the time plaintiff spent in the sun during the days immediately prior to the appearance of the blemishes. (*Id.* ¶ 15).

---

4. Plaintiff objects to Cohen's affidavit on the ground that she had "not been afforded the opportunity to cross-examine [Cohen]." (Pl.Mem. at 6). The Court agrees with defendants that plaintiff's argument is untimely. Plaintiff failed to avail herself of the opportunity to take Cohen's deposition during the discovery phase of this litigation and therefore she may not be heard to complain now.

Cases of sun poisoning are common during May and June when the sun's rays are striking the earth at a more direct angle than during the winter and the skin is more sensitive, having not been exposed to as much sunlight during the winter months. (*Id.*). Further, the symptoms plaintiff described were those of mild sun poisoning: raised, pink bumps or blisters that appear on the exposed surface shortly after exposure to the sun. (*Id.*). Moreover, the placement of the injuries is consistent with sun poisoning as there are no scars or wounds on plaintiff's upper lip or neck, areas that would have been shaded from direct exposure to the sun by the nose, chin, and jaw line. (*Id.* ¶ 16). The placement of the injuries is "entirely inconsistent," however, with an adverse reaction to Oil of Olay because plaintiff asserts that she applied the Product to both the affected and unaffected areas, including her lower lip and neck. (*Id.*).

Second, Cohen testified at his deposition that "[i]t is entirely possible that [plaintiff] developed a case of acne caused by Depo–Provera, and then picked at the acne blemishes causing infection and scarring." (*Id.* ¶ 19). According to the Physicians' Desk Reference, which Cohen testified is a source widely used by physicians, the known side effects of Depo–Provera include acne and rashes. (*Id.* ¶ 18 & Ex. 4 at 2545–46). The Physicians' Desk Reference states that in a clinical trial with over 3900 women, one to five percent of the women developed acne or rashes. (*Id.* Ex. 4 at 2545).

### e. Dr. Jeanine Downie

On March 12, 1998, plaintiff identified Dr. Jeanine Downie as an expert witness. (Packer Aff. ¶ 12 & Ex. 9). Downie's medical chart for plaintiff includes the notation "neurotic excoriations scarring." (Packer Aff.Ex. 10). After Downie examined plaintiff, plaintiff withdrew her as an expert witness. (*Id.* ¶ 19).

### B. Prior Proceedings

Plaintiff filed this case in New York Supreme Court, New York County, on July 15, 1997. Defendants removed the case to this Court on July 30, 1997 pursuant to 28 U.S.C. §§ 1332 and 1441.

As noted, plaintiff initially identified Downie as her expert. On May 6, 1998, during a premotion conference, plaintiff informed the Court that plaintiff was withdrawing Downie as an expert. As plaintiff had had more than nine months in which to designate an expert, the Court ordered plaintiff to identify an expert and produce that expert's report by May 22, 1998. The Court warned plaintiff that if she failed to comply with the order that plaintiff would be precluded from presenting expert testimony. On June 16, 1998, three weeks after the final deadline imposed by the Court, plaintiff had still failed to provide any meaningful expert discovery. Accordingly, the Court issued an order precluding plaintiff from presenting any expert testimony at trial.

This motion followed.

### DISCUSSION

The following issue is presented on the motion: Whether a triable issue of fact exists as to whether the Product was defective and caused plaintiff's injuries.

### A. Applicable Legal Standards

#### 1. Summary Judgment

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving parties favor. *See id.* at 249–50, 106 S.Ct. 2505.

To defeat a motion for summary judgment, however, the nonmoving party "must do

more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). As the Supreme Court stated in *Anderson:* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### 2. *Products Liability*

██ Under New York law, which the parties agree is controlling, a plaintiff asserting a products liability claim must prove that defendant's product was both defective and the proximate cause of her injuries. "[W]hether the action is pleaded in strict products liability, breach of warranty[,] or negligence," plaintiff bears the burden of showing "that a defect in the product was a substantial factor in causing the injury." *Tardella v. RJR Nabisco, Inc.,* 178 A.D.2d 737, 576 N.Y.S.2d 965, 966 (3d Dep't 1991) (affirming trial court's grant of summary judgment in favor of manufacturer and distributor of candy bar, in which was embedded a pin that was swallowed by plaintiff's infant); *see Sawyer v. Dreis & Krump Mfg. Co.,* 67 N.Y.2d 328, 502 N.Y.S.2d 696, 698, 493 N.E.2d 920 (1986) (holding that plaintiff must prove that defendant's negligent failure to warn of the dangers of using its product or defendant's improper design caused plaintiff's injury).

██ The existence of a defect may be inferred by circumstantial evidence when the product does not perform as intended and plaintiff's proof excludes the possibility of other causes. *See Karr v. Inecto,* 247 N.Y. 360, 364–65, 160 N.E. 398 (1928) (upholding trial court's dismissal of plaintiff's claim that defendant's hair dye caused plaintiff's injury where "possibility of other cause [was] not excluded"); *Rosa v. General Motors Corp.,* 226 A.D.2d 213, 640 N.Y.S.2d 548, 549 (1st

Dep't 1996) (holding that no inference of defect arose because plaintiff failed "to exclude all other causes" of the accident and presented no direct evidence of a defect); *Henry v. General Motors Corp.,* 201 A.D.2d 949, 609 N.Y.S.2d 711 (4th Dep't), *leave to appeal denied,* 84 N.Y.2d 803, 617 N.Y.S.2d 137, 641 N.E.2d 158 (1994) ("In a case based entirely upon circumstantial evidence, the jury may infer that the product was defective when it left the manufacturer's control only if plaintiff excludes all causes of the [injury] not attributable to defendant."); *Olsovi v. Salon DeBarney,* 118 A.D.2d 839, 500 N.Y.S.2d 325, 326 (2d Dep't 1986) (stating that "plaintiff must demonstrate, at a minimum, that her injuries are the direct result of the product[ ]" and that the product was "the sole possible cause" of her injuries); *Smith v. Squire Homes, Inc.,* 38 A.D.2d 879, 329 N.Y.S.2d 243 (4th Dep't 1972) ("When the precise cause of the accident is left to conjecture and may be as reasonably attributed to a condition for which no liability attaches as to one for which it does, then the plaintiff is not entitled to recover and the evidence should not be submitted to the jury.").

██ Mere use of the product and subsequent injury, however, are not a sufficient basis from which to infer causation. *Karr,* 247 N.Y. at 364–65, 160 N.E. 398 (holding that plaintiff's mere exposure to defendant's hair dye twelve hours before her injury, without more, was insufficient to sustain the inference that the product caused the injury); *see Henry,* 201 A.D.2d 949, 609 N.Y.S.2d 711 (overturning jury verdict for plaintiff as based on pure conjecture where plaintiff attempted to establish a prima facie case by proof of the occurrence of the accident without direct evidence and without excluding other possible causes); *Olsovi,* 500 N.Y.S.2d at 326 ("The cornerstone rule in products liability is that proof of mere injury furnishes no rational basis for inferring that the product was defective for its intended use." (quoting *Helene Curtis Indus., Inc. v. Pruitt,* 385 F.2d 841, 853 (5th Cir.1967), *cert. denied,* 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968))).

## B. *Application*

### 1. *Plaintiff's Evidence*

■ Plaintiff's evidence of causation is purely circumstantial and consists mainly of testimony that she used Oil of Olay for four days after which her injuries developed. Even accepting this testimony, however, plaintiff's evidence is insufficient to support a finding that defendants' product was defective or that it caused plaintiff's injuries.

Plaintiff testified that she used the Product for four days and that she had not recently begun using any other new product. At the end of the second day of using the Product, plaintiff noticed that her skin was slightly pink. On the third day, she noticed pink spots on her skin. By the fourth day those spots had turned into raised bumps and blisters.

Plaintiff cites Dallas's testimony that Oil of Olay *could* have caused plaintiff's initial itching. This testimony does not create an issue of fact. First, Dallas's opinion that plaintiff's initial irritation *could* have been caused by plaintiff's use of Oil of Olay was not based on anything other than plaintiff informing him that she had recently begun using the Product. (*Id.* at 51–53 (stating that there was no reason to "doubt ... or confirm" that Oil of Olay caused plaintiff's initial reaction and that "[s]he said she used it, she broke out")). Dallas did not perform any tests on the product, nor did he make any attempt to rule out other possible causes. (*Id.* at 53). Second, Dallas was merely speculating. He did not opine that the Product caused plaintiff's initial irritation to a reasonable degree of medical certainty. Moreover, Dallas is a cardiologist and general practitioner, not an expert witness.

Plaintiff has not presented evidence from which a reasonable jury could find that the Product was defective or that it caused her injuries. Notably absent from plaintiff's evidence are: a sample of the Product, any tests conducted on the Product, and expert testimony that plaintiff's injuries are linked to her use of the Product. Indeed, plaintiff has failed to present any concrete evidence that her injuries were caused by her use of Oil of Olay or that it was defective.

### 2. *Defendant's Evidence*

Defendant has presented evidence of other possible causes for plaintiff's injuries including: neurotic excoriations, mild sun poisoning, and Depo–Provera. Although an issue of fact arguably remains as to whether plaintiff's condition was caused by neurotic excoriations, plaintiff has failed to present sufficient evidence from which a reasonable jury could rule out the possibility of other causes of plaintiff's injuries.

### a. *Neurotic Excoriations*

Defendant has presented expert testimony that, to a reasonable degree of medical certainty, plaintiff's injuries are a result of neurotic excoriations. (*Id.* ¶ 6). Cohen testified that there was "no doubt in [his] mind" that plaintiff's injuries were entirely self-inflicted.[5] (*Id.* ¶ 20). Further, prior to her being withdrawn as plaintiff's expert witness, Downie examined plaintiff and wrote the notation "neurotic excoriations scarring" on plaintiff's medical chart. (Cohen Aff.Ex. 3). Moreover, even Dallas, her past employer, acknowledged that plaintiff's injuries were probably caused by plaintiff scratching or digging her skin after some initial skin irritation. (*See* Packer Aff.Ex. 8 at 44–45, 50–51, 55).

As Cohen testified was "particularly telling," plaintiff had new wounds and scars when he examined her that were not present during plaintiff's videotaped deposition.[6] In an attempt to explain how plaintiff could have new wounds on her face at the time of Cohen's examination, plaintiff asserts in her memorandum of law that "[i]t is clearly argu-

---

**5.** Cohen is an expert in the field, board certified in Dermatology and Occupational and Environmental Medicine. (Cohen Aff. ¶ 2). He teaches at New York University Medical School and practices dermatology. (*Id.* ¶ 3). Cohen has lectured and published extensively in the area of dermatology. (*Id.* ¶ 4 & Ex. 1 at 4–10).

**6.** The Court has compared the deposition videotape with photographs taken during Cohen's examination and agrees that a reasonable jury could only conclude that plaintiff had new injuries when she was examined by Cohen.

able that plaintiff's symptoms were latent and gradually manifested themselves over a protracted period of time." (Pl.Mem. at 15). Cohen testified, however, that "[n]o over-the-counter face cream, Oil of Olay included, could have caused new scarring or fresh skin ulcers on [plaintiff's] face months after she stopped using the product." (Cohen Aff. ¶ 10). Plaintiff does not present any evidence to refute Cohen's assertion.

Plaintiff has asserted, however, that she has not scratched and picked at her skin because she is an aspiring model. (Pl. Aff.¶ 37). Despite Dallas's testimony "that it is atypical for such infection to persist without picking of the skin," plaintiff clings to Dallas's statement that "just plain trauma can make the lesions worse." (Pl.Mem. at 16). Plaintiff goes so far as to state, with no apparent authority, that "there [is] a *substantial minority* of people whose infections will persist without scratching or picking at the skin." (*Id.* (emphasis added)). Plaintiff claims, in a conclusory manner, to be one of this "substantial minority" who was "[c]learly ... experiencing trauma." (*Id.*).

Dallas's comments, however, make it clear that he did not believe that plaintiff's injuries were caused by trauma alone. When asked during his deposition why an infection might persist for over ten months after beginning treatment with antibiotics, Dallas replied:

> People who pick at their skin a lot, they will help perpetuate a problem like that, and that would then be repeated infection. Or just plain trauma can make the lesion worse. I have had several such cases of people who really pick at themselves and did this sort of thing.

(Pl.Mem.Ex. F at 50). On the next page of Dallas's deposition transcript, when asked if he could think of any reasons why plaintiff's condition could have lasted several months after the initial outbreak, Dallas replied: "No, other than the one that I mentioned." (*Id.* at 51). Dallas also stated that he "was worried that [plaintiff] might be aggravating [the condition] herself." (*Id.* at 52). Not only could no reasonable jury conclude that Dallas believed that plaintiff's injuries were caused by trauma alone, a reasonable jury could only conclude that he believed that plaintiff's condition was caused by her picking at her own skin.

Nonetheless, even accepting for purposes of this motion plaintiff's implausible claim that she did not scratch and dig at her skin, and even assuming a reasonable jury could exclude neurotic excoriations as a possible cause of plaintiff's injuries, summary judgment would still be appropriate because a reasonable jury could not exclude other causes: sun poisoning and Depo–Provera.

### b. *Sun Poisoning*

Defendant has presented evidence that in Cohen's opinion, for the reasons stated above, any initial skin irritation was most likely caused by mild sun poisoning. (Cohen Aff. ¶ 20).

Plaintiff responds by arguing that: (1) the prevalence of sun poisoning in May and June "does not mean that everyone who lies in the sun at that time of year" develops sun poisoning; (2) if plaintiff's blemishes were a result of sun poisoning, blemishes should have appeared on all parts of her skin that were exposed to the sun's rays; and (3) that sun poisoning is not the only possible cause of raised bumps, blisters, and scarring. (Pl. Mem. at 18).

Although plaintiff testified that she had never experienced a sunburn or other adverse reaction to the sun, she has not presented evidence from which a reasonable jury could rule out sun poisoning as a possible cause of her injuries. Further, while plaintiff did not develop blemishes on other parts of her skin that were exposed to the sun, she did not present any evidence that sun poisoning manifests, if at all, only on every part of the skin exposed to the sun. Moreover, that sun poisoning is not the only possible cause of raised bumps, blisters, and scarring is irrelevant because defendant need not prove that sun poisoning is the only cause. Plaintiff simply has not presented any evidence to the effect that her injuries could not have been the result of sun poisoning.

### c. *Depo–Provera*

Defendant has also presented evidence of the possibility that any initial skin irritation was caused by an adverse reaction to Depo–Provera. Both Cohen and Beitner testified that Depo–Provera can cause acne and skin rashes. (Cohen Aff. ¶ 18 & Ex. 4; Packer Aff.Ex. 11 at 20–21). According to both Cohen and Dallas, plaintiff's condition may have began with acne. (Cohen Aff. ¶ 19; Pl.Mem. Ex. F at 54).

Plaintiff argues that Depo–Provera could not be the cause of plaintiff's condition because the blemishes would have appeared in the beginning of May 1997 when plaintiff received her first injection. Plaintiff's assertion is speculative, however, as she fails to present any evidence that Depo–Provera cannot cause acne or a rash after the first month. Plaintiff therefore fails to present sufficient evidence on which a jury could exclude Depo–Provera as a possible cause of plaintiff's injuries.

### CONCLUSION

In sum, plaintiff's claim that her injuries were caused by her use of Oil of Olay is based on sheer surmise and speculation. She has presented no concrete proof, medical or otherwise, to raise a genuine issue of fact for trial. Accordingly, defendants' motion is granted and the complaint is hereby dismissed, with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.