J. Edward ROBINSON, Plaintiff,

v.

TIME WARNER INC. and Michael Hayes, Defendants.

No. 97 Civ. 5103(RWS).

United States District Court, S.D. New York.

April 21, 2000.

---

**16.** 17 Moore § 110.04[1], at 110–42 & n. 6.

**17.** 38 F.3d 668 (2d Cir.1994).

Leib, Kraus, Grispin & Roth, Scotch Plains, NJ, by Gary E. Roth, of counsel, for Plaintiff.

Friedman Kaplan & Seiler, New York City, by Bruce S. Kaplan, Robert D. Kaplan, Katherine L. Pringle, of counsel, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Time Warner, Inc. ("TWI") and Michael Hayes ("Hayes") have moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment to dismiss the amended complaint of plaintiff J. Edward Robinson ("Robinson") alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et. seq.*, and tortious interference with prospective economic advantage. For the reasons set forth below, the motion will be granted in part and denied in part.

### The Parties

Robinson was an employee of TWI (or Warner Communications, Inc., prior to its merger with Time Inc.) in its Internal Audit Department (the "Department") from October 1986 until September 12, 1997, and claims race-based discrimination and/or retaliation from 1988 through the termination of his employment.

TWI is a corporation located within the state of New York.

Hayes was the Vice President of the Department from April 1995 until Robinson's termination in September 1997.

### Prior Proceedings

Robinson filed this action asserting claims for race discrimination under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYHRL"), on July 11, 1997, having previously filed a charge of discrimination by the defendants with the Equal Employment Opportunity Commission ("EEOC") on January 13, 1997. Robinson, a member of the Department, alleged that he had been passed over for promotions between 1988 and 1995, and that beginning in 1995, he had been discriminated against by Hayes, Vice President of Internal Audit, who demoted him, and put him on oral warning in 1996 in retaliation for Robinson's internal complaint of discrimination.

After the Department was outsourced by Ernst & Young ("E & Y"), Robinson amended his pleading to add the allegation that the defendants were responsible for his not being offered a position with E & Y, that they interfered with Robinson's prospect of obtaining employment with E & Y, and that they retaliated against him for his formal and informal complaints of discrimination, thereby violating Section 1981 and the NYHRL and giving rise to a common-law claim for tortious interference with prospective economic advantage.

The parties engaged in comprehensive discovery, exchanging thousands of pages of documents and deposed seventeen witnesses. The instant motion was heard and

marked fully submitted on January 17, 2000.

### The Facts

The facts set forth below are taken from the parties Rule 56.1 statements, affidavits, and exhibits. What follows is gleaned from these submissions, with any factual inferences drawn in Robinson's favor.

In October 1986, Robinson, who is African–American, commenced employment with Warner Communications, Inc., as an Audit Supervisor in the Internal Audit Department. In 1990, Warner Communications, Inc., merged with Time, Inc., to become TWI.

As an Audit Supervisor, Robinson initially reported to Robert Burkert, an Audit Manager. In 1988, Robinson was promoted to Audit Manager. As Manager, Robinson reported directly to the Vice President of the Department, John W. Thomas. After Thomas's retirement in mid–1993, Robinson began reporting to Thomas's replacement, John LaBarca, until LaBarca's replacement by Hayes in 1995.

During the period in which Robinson reported to Thomas and then LaBarca, Robinson sought but was not granted promotion to manage a satellite office (in either London or Los Angeles). Also, in 1993 an offer for Robinson to fill the Controller position at the DC Comics division was revoked. All of the Robinson sought positions were given to white employees.

During the same period, however, Robinson received sizeable merit salary increases, stock options awards, and performance-based bonuses. In 1992 TWI also sponsored Robinson for an Executive MBA program at New York University.

Robinson brought up what he perceived as a problem of institutional racism with Michael Watson ("Watson"), a Human Resources Manager, who told Robinson that there was a low number of minority executives in a company of approximately 44,000 employees, including the Internal Audit Department. Robinson himself observed that there was only African–American who held an executive (i.e. Director or above)

financial position at TWI's corporate division.

In April 1995, Hayes became Vice President of the Department. During the thirteen years prior to Hayes joining the Department, during which he had worked elsewhere within TWI, Hayes had a total of five minority employees reporting to him. Of the six Managers and Directors reporting to him during that period, five were white males. The sixth was Tim Harris, who worked for Hayes while Hayes headed the Finance Department, and ultimately worked under him again when he came to the Internal Audit Department.

Prior to Hayes taking over the Department, the essential difference between a Manager and a Director was in terms of job title and salary grade level (Managers were Grade 15 and Directors were Grade 18). The management team for the Department was comprised of both the Directors and the Managers, all of whom reported directly to a Vice President of the Department. Both Directors and Managers issued their own audit reports, were responsible for delegating duties to Department staff—including Audit Supervisors—and had to resolve issues concerning delegation of those duties.

Shortly after becoming head of the Department, after a "get to know" lunch meeting, Hayes asked Robinson if he had watched the movie Hoop Dreams. After Robinson replied that he had not and knew nothing about the movie, Hayes told Robinson that he had attended the college discussed in the movie and stated that "some of my best friends were black."

In April 1995, Robinson told Hayes that he sought a promotion. Hayes did not promote Robinson. In June 1995, Hayes met with Robinson and discussed four performance areas that Hayes said were holding Robinson back from promotion: management of projects and people, business judgment, knowledge of businesses and organizations, and work ethic. At this time, Hayes placed Robinson on an "action plan" to address each of these areas.

Hayes asserted that his comments were based on feedback from division management and audit staff, but refused Robinson's request to speak with Robinson's primary contacts within the divisions. Hayes kept notes concerning his conversations about Robinson with staff members, although some of these notes were not maintained contemporaneously. In addition, although Hayes memorialized a negative comment about Robinson by LaBarca in February 1995, at which time LaBarca was still Vice President of the Department, LaBarca denied making that statement. In fact, during LaBarca's performance evaluation meeting with Robinson that same month, LaBarca gave Robinson a favorable evaluation, a merit salary increase, a bonus, and stock options.

Around the time of the June 1995 meeting, Hayes objected to an expense voucher Robinson had submitted in connection with a lunch involving the New York Urban League.

About one month after putting Robinson on an "action plan," Hayes compiled an assessment of the six Audit Managers' and Directors' work in five performance categories. The three white males received among them five "excellent" ratings, nine "above average", and one "average". The two African–American males and one female received among them one "excellent" rating, one "above average", six "average", and seven "below average". Hayes rated Robinson below average in the categories entitled "Drive and Business Judgment." Hayes had not attended any of Robinson's closings, visited any of his audit sites, or reviewed any of his audit reports.

On August 9, 1995, without notice or discussion, Hayes reduced the authority, duties, and responsibilities of Robinson and another Manager, Tim Harris. Robinson and Harris were the only African–American members of the management team, comprised of Directors and Managers, for the Department. In the past, the authority, duties, and responsibilities of Directors and Managers were equivalent. Robinson and Harris were now required to report to Burkert, who had previously been promoted to a Director, and to have him review their audit reports before issuance, although in the past Robinson and Harris were responsible for issuing their own audit reports.

Robinson and Harris complained to Watson, the Human Resources Manager responsible for the Department, that the demotions appeared to be racially motivated. Watson told Robinson that he was not aware of a reorganization that would have resulted in the demotions. In this regard, neither Burkert, one of the Department Directors, nor Bijur, the Human Resources Director responsible for the Department, had an understanding either as to why Hayes took actions affecting only Robinson and Harris in August 1995.

Approximately three months later, in November 1995, again without prior discussion or memoranda, Hayes announced a reorganization of the Department into a three-tier structure with each tier headed by a Director reporting to Hayes. According to Hayes, this reorganization was directed by his superiors with the aim of running the Department more efficiently. At the time of the November 1995 reorganization, Hayes had already retained E & Y to study whether a reorganization was necessary but E & Y was not due to submit its recommendations until January 1996.

After the August 1995 demotion and November 1995 reorganization, Robinson's and Harris's authority, duties, and responsibilities were reduced to the level of an Audit Supervisor even though in the past Audit Supervisors reported to these three Managers. The three of them no longer reported directly to the Vice President of the Department (now Hayes), but instead were required to report to the Directors; were no longer invited to the periodic (usually monthly) department management meetings; no longer issued their own audit reports, but instead were required to have them reviewed by a Director before issuance; were provided job

descriptions specifying that their authority, duties, and responsibilities were identical to those of Audit Supervisors, whereas in the past his job description was identical to that of Directors; no longer had authority to delegate assignments to Department staff and resolve delegation issues; and were listed on the Department Directory with the Audit Supervisors rather than, as had been the practice in the past, with the Directors. In addition, their rights to be granted stock options were removed.

At the time of the reorganization, Hayes also promoted the only white male Manager, Richard Stein ("Stein"), to a Director. Stein had been with TWI less than a year. Both Stein and Robinson were Certified Public Accountants, but Robinson had an MBA in Management while Stein had only an undergraduate degree. Robinson had also helped train Stein. Hayes also reduced the authority, responsibilities, and duties of Jane Campbell, who was the only other Manager and the only female member of the management team, in the same manner as with Robinson and Harris.

At the time that Stein was promoted, TWI had a written affirmative action policy that required that minority candidates be given preference in hiring and promotion over other candidates with similar qualifications. The stated purpose of this policy was to accelerate minority hiring and promotion. Every employee was given a copy of the policy each year and all members of management were informed at least annually that they were required to comply with it. Hayes has denied awareness of TWI's affirmative action policy.

As a result of the reorganization, only white males (Duncan Campbell, Robert Burkert, and Richard Stein), reported directly to Hayes. After the November 1995 reorganization, Hayes added five more Managers, either by way of new hire or promotion, all of whom were required to report to a Director.

Robinson and Harris again complained to Watson that they believed that their race (and Campbell's sex) was a motivating factor in the changes in the Department's organization.

On January 11, 1996, Hayes gave Robinson his 1995 oral performance review, during which Hayes criticized Robinson's performance and placed him on a "watch list". Hayes gave Robinson a salary increase of 1.5%, which was the lowest Robinson had ever received. He also gave Robinson a bonus of $2,000, whereas the prior year LaBarca had given Robinson a bonus of $13,500. One month later, Hayes decided that Robinson, Harris, and Campbell would not receive stock options for 1996, although in the past Managers were eligible for these options.

In March 1996, Hayes hired Curtis Strohl ("Strohl"), a white male, under the newly-created title of Senior Manager. Despite his title, Strohl was at the same salary grade as Robinson, Harris, and Campbell. However, he reported directly to Hayes with respect to the more significant aspects of his work. Strohl was also awarded stock options, which meant that all white males at salary grade 15 or above received stock options.

A second Senior Manager, Norlin Evans ("Evans"), an African–American male, was subsequently added to the Department as a result of TWI's merger with Turner Broadcasting. Evans was given a direct reporting line to a Director, Stein, rather than to Hayes, although Evans had been an Acting Director at Turner Broadcasting. Hayes also hired a new Director in 1996, Robert Perkins ("Perkins"), who is African–American.

Robinson met with Watson on April 29, 1996, as well as with Watson's supervisor, Priscilla Bijur, on the following day, at which meetings he stated his belief that he continued to be the victim of race discrimination.

Two weeks after Robinson's internal complaint, on May 11, 1996, one of the Department Directors, Burkert, instructed Robinson to provide him with a detailed accounting of Robinson's whereabouts and

assignments on a daily basis between October 1, 1995 and March 31, 1996.

TWI retained an attorney, Lawrence Levien, Esq., to investigate Robinson's complaint of racial discrimination. Three months after the completion of Levien's investigation, on December 10, 1996, Robinson was placed on oral warning. Soon thereafter, on January 7, 1997, Hayes prepared a memo which indicated that Richard Bressler ("Bressler"), to whom Hayes reported, considered Robinson to be a "C—" performer. Bressler, however, denied rating Robinson as such. On February 28, 1997, Burkert and Perkins gave Robinson a written performance warning advising him that he would be fired if he did not improve in four generally subjective areas by April 30, 1997.

Hayes did not send Robinson for outside management coaching to improve his performance, although Hayes had done so for Burkert, a white male.

On March 17, 1997, TWI's corporate doctor hospitalized Robinson after administering and reviewing the results of several EKGs. Ultimately, it was determined that Robinson had a heart spasm. After approximately four weeks, Robinson's doctor was satisfied that Robinson could return to work in terms of his physical health, but that Robinson should be kept out pending a psychological evaluation. Robinson was diagnosed as suffering from major depression and stress-related disorders, and his treating therapist continued him on disability leave.

In 1996, E & Y had recommended that it replace the Department in performing the internal audit function. The TWI Board of Directors approved this proposal in July 1997. In mid-July, while out on disability leave, Robinson received a memo from Hayes announcing that, effective September 15, 1997, the internal audit function at TWI would be eliminated and outsourced to a newly-created business unit at E & Y. The new unit at E & Y was to be staffed with existing TWI members of the Internal Audit Department, who would become E & Y employees.

E & Y followed a three-part process. On July 31 and August 1, 1997, each auditor interested in working for E & Y was interviewed by two E & Y employees, one audit partner, and one human resources professional. Comments were solicited about the candidates from E & Y external auditors who had worked on the TWI engagement. On August 1, the E & Y team members met to discuss each candidate and decide whether or not to hire him or her. At the conclusion of this process, Robinson was not offered a job by E & Y.

Robinson interviewed at E & Y on July 31, 1997, with Marlene Currie ("Currie"), a Human Resources representative, and Peter Howe ("Howe"), the E & Y engagement partner who had serviced the Department and who was to be in charge of the outsourced TWI Internal Audit employees.

Currie's interview evaluation form concluded that Robinson should be extended an offer. Howe's evaluation form, however, included comments that were similar to those made to Robinson about his performance by Hayes. In addition, two E & Y field auditors who had worked on the TWI account commented on Robinson's candidacy, although neither worked directly with Robinson.

The minutes of the August 1 E & Y team meeting stated with respect to Robinson that:

> Mr. Robinson's background for the position of internal audit manager was determined to be inconsistent with the needs of Ernst & Young Resources' Internal Audit Services practice. Specifically, Mr. Robinson has held the position of internal audit manager for Time Warner since October of 1986, yet based on prior interaction with Ernst & Young external auditors he was observed to be ineffective in completing work and inconsistent in certain other necessary behaviors, such as reliability and team participation. His verbal communication ability, based on previous contact with E & Y personnel and his interviews with E

& Y personnel, was not at the requisite level of a manager. Descriptions in the interview of his management style and his delegation of work did not indicate an ability to develop people beyond assigning them tasks. In addition, in previous contact with Mr. Robinson, he did not demonstrate the ability to apply the knowledge he seemed to have to the business operations. Transferring knowledge to others, developing people, and communicating effectively are all requirements for a managerial position within Ernst & Young. These abilities are especially vital to the internal audit outsourcing business. As a result, the interviewing group reached a consensus that an offer of employment should not be extended to Mr. Robinson.

Of the 33 former TWI Internal Audit people interviewed by E & Y, four were not offered jobs. Two of them, Ted Kramer and Russell Danziger, had been terminated and/or rated as poor performers in previous positions at E & Y. The other two were Robinson and Jill Korn. Like Robinson, in the past Korn had alleged that she had suffered discriminatory treatment by Hayes while at TWI.

Robinson's position was given to Dawn Burnap, whose experience and credentials did not match Robinson's.

Every E & Y witness, including Howe, stated he or she received no input from anyone at TWI. Howe, who had served as the E & Y engagement partner servicing Hayes' Department, had lunched privately with Hayes a week before Robinson's interview.

On or about August 1, 1997, Robinson was given a job elimination package by TWI with a termination date of September 12. By letter of August 8, 1997, Robinson was informed that E & Y would not be offering him a position.

After his termination, Robinson opened his own CPA practice working out of his home.

### Discussion

TWI has moved for summary judgment on the grounds that the undisputed facts show that: (1) TWI did not interfere with Robinson's efforts to secure employment at E & Y; (2) Hayes reorganized the Department and promoted Stein for legitimate, non-discriminatory reasons; (3) the December 10, 1996 oral warning was not retaliatory; and (4) Robinson cannot assert a claim under 42 U.S.C. § 1981 because he was an at-will employee. In addition, TWI argues that Title VII claims pertaining to events occurring more than 300 days before Robinson filed his EEOC charge, i.e., before March 19, 1996,[1] are barred on statute of limitations grounds as well as section 1981 and NYHRL claims occurring more than three years before the filing of the complaint in this case, i.e., July 11, 1994. Finally, TWI argues that Robinson's demand for punitive damages should be stricken because Robinson cannot met the legal standard for such damages.

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106

---

1. There is a slight discrepancy in the pleadings as to the EEOC charge filing date. TWI states that this occurred on January 19, 1997, while Robinson refers to the date of January 13, 1997. The EEOC letter authorizing Robinson to pursue his claim in federal court states that March 19, 1996 was the date 300 days prior to his filing of the EEOC charge, and the Court will presume this is correct. In any event, the discrepancy of six days does not affect the statute of limitations analysis, discussed infra.

S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Additional considerations factor into a summary judgment motion in an employment discrimination action. *See Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and deposi-

tions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo,* 22 F.3d at 1224. This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. The Second Circuit has made clear that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994); *see Meiri,* 759 F.2d at 998.

Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri,* 759 F.2d at 998; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather must set forth " 'concrete particulars' " showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (*quoting R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

## II. *The Legal Standards Governing Title VII and the New York Human Rights Law Claims*

As the Second Circuit has explained, the "ultimate issue" in any employment discrimination case is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermis-

sible reason.'" *Stratton v. Department for the Aging*, 132 F.3d 869, 878 (2d Cir. 1997).

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [ ]." 42 U.S.C. § 2000e–2(a)(1).

■ The basic framework for Title VII discrimination claims is the three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell*, the plaintiff has the initial burden of establishing a *prima facie* case of unlawful race discrimination by showing that the plaintiff is: (1) a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817; *Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The requirements for establishing a *prima facie* case are not onerous. *See Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Austin*, 149 F.3d at 152.

If a plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory purpose for the adverse employment decision. *See McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817; *Austin*, 149 F.3d at 153; *Woroski*, 31 F.3d at 108.

Once the employer articulates such a purpose, the burden shifts back to the plaintiff to show that the "employer's proffered reasons are shown to be a pretext for discrimination." *Austin*, 149 F.3d at 153 (citations omitted). To make this showing, the plaintiff must demonstrate "*both* that the [proffered] reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742.

■ Title VII also provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful practice by this subchapter ...." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her discrimination claim was valid in the first instance. *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990).

■ A *prima facie* case of retaliation under Title VII requires a showing that (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *See Tomka*, 66 F.3d at 1308; *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir.1993); *Burrell*, 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (*citing Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *See Tomka*, 66 F.3d at 1308. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a

pretext for retaliation. *See Tomka*, 66 F.3d at 1308.

■ Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Gilani v. National Ass'n of Securities Dealers, Inc.*, No. 96 CV 8070, 1997 WL 473383, at *7 (S.D.N.Y. Aug.19, 1997) (*citing Williams v. Boorstin*, 663 F.2d 109, 115 (D.C.Cir.1980)).

The protections offered by and the standards governing liability under the New York Human Rights Law are virtually identical to those under Title VII. *See Ortega v. New York City Off–Track Betting Corp.*, No. 97 Civ. 7582(KMW), 1999 WL 342353, at *3 n. 2 (S.D.N.Y. May 27, 1999); *Gibson v. Jacob K. Javits Convention Ctr.*, No. 95 Civ. 9728(LAP), 1998 WL 132796, at *4 & n. 4 (S.D.N.Y. Mar.23, 1998); *Coffey*, 170 F.3d at 326; *see also Tomka*, 66 F.3d at 1305 n. 4. Thus, the *McDonnell* analytic framework and the discussion below apply equally to Robinson's state law causes of action.

### III. *Robinson Has Presented Factual Issues With Respect To Whether The Demotion and Failure To Promote By Hayes Were Discriminatory*

#### A. *Demotion*

Robinson has set forth sufficient evidence to raise a triable issue of fact with respect to whether his demotion in connection with the 1995 reorganization of the Department was based on discriminatory intent.

With respect to Robinson's *prima facie* case, there is little doubt that he has satisfied the first three prongs of the *McDonnell* test. First, he is African–American, making him a member of a protected class. Second, he was apparently qualified for his position, as evidenced by the fact that he had been serving in that position for over six years. Third, although Robinson's job title was not changed in the reorganization, it cannot seriously be disputed that

the terms and conditions of his employment, including but not limited to the loss of his stock options, were negatively affected. *See de la Cruz*, 82 F.3d at 20–21; *Brennan v. City of White Plains*, 67 F.Supp.2d 362, 372–73 (S.D.N.Y.1999).

■ With respect to whether the circumstances give rise to an inference of discrimination, Robinson primarily relies on what he alleges was differential treatment of similarly situated individuals who are not part of the protected group, i.e., non-African Americans. This is a recognized method of satisfying the fourth prong of the *McDonnell* test. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997); *see also Taylor v. Runyon*, No. 97 Civ. 2425, 1997 WL 727488(RWS), at *6 (S.D.N.Y. Nov.20, 1997). Robinson points to the fact that in August 1995, only he and Harris, who were the sole African–American members of the management team, had portions of their authority, duties, and responsibilities taken away. Similarly, in the November 1995 reorganization, only Robinson, Harris, and Campbell (the only woman), again saw their authority, duties, and responsibility diminished, as well as their compensation in the form of stock option rights.

■ In addition to facts indicating differential treatment, there is the comment Hayes made regarding how "some of his best friends were black," and his criticism of Robinson's Urban League lunch. "[I]nvidious comments about others in the employee's protected group" are among those additional circumstances which may contribute to a permissible inference of discriminatory intent. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted); *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1086 (3d Cir.1996). There is also the fact that over the course of Hayes's thirteen-year career at TWI, he had only ever had one African–American in a management position reporting to him, and shortly after joining the Department he reorganized it so that those African–Americans

who previously reported to the person in Hayes's position no longer did so. All of these facts, in conjunction with the evidence of differential treatment described above, suffice to meet Robinson's *de minimis* burden with respect to establishing a *prima facie* case.

By way of rebuttal, TWI alleges that there was a legitimate, nondiscriminatory reason for Robinson's demotion, i.e., that it (as well as Harris's) was part of a department-wide reorganization made for purposes of efficiency and profitability. This reason, if true, would be non-discriminatory and therefore satisfies the burden on TWI at this stage of the analysis. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In addition, in reference to the inference Robinson seeks to draw that Hayes did not want minorities reporting to him, TWI points to the fact that Hayes hired Perkins, an African–American, as a Director in 1996, and that Evans, also an African–American, became a Senior Manager under Hayes.

Robinson can overcome TWI's rebuttal by showing that it is pretextual, that is, the articulated reason is false and that the actual motivation was discriminatory. *See Burdine,* 450 U.S. at 254–56, 101 S.Ct. 1089. Robinson points out that the formal Department reorganization actually took place three months after Robinson and Harris were demoted, and that Watson from Human Resources knew of no reorganization in August 1995. There is also the fact that Burkert and Bijur stated that they had no understanding as to why Hayes took actions affecting only Robinson and Harris in August.

■ The evidence which made up Robinson's *prima facie* case is also properly considered in determining whether there is a triable issue of fact as to whether TWI's justification is pretextual. *See Hicks,* 509 U.S. at 511, 113 S.Ct. 2742. This evidence includes the fact that the only two African–American members of management were demoted and the comments by Hayes.

TWI and Hayes urge that the small numbers involved and the fact that the demotion involved a single employment decision is insufficient to show pretext. *See Cobbs v. CBS Broadcasting Inc.,* 97 Civ. 8284(MBM), 1999 1999 WL 244099, at *7 (S.D.N.Y. Apr.26, 1999). However, this fact does not stand alone but instead must be considered along with the other evidence discussed above. *See Deloach,* 897 F.2d at 820. Under that standard, Robinson has set forth sufficient evidence to raise a triable issue of fact as to whether his demotion was motivated by discriminatory intent.

**B.** *The Failure to Promote Robinson and the Promotion of Stein*

■ With respect to the promotion of Stein to a Director, Robinson had requested promotion to that position, and was apparently qualified for it, yet Stein, who is white, ultimately got the promotion. These facts in an of themselves may suffice to demonstrate a *prima facie* case of discrimination. *See Burdine,* 450 U.S. at 254 and n. 6, 101 S.Ct. 1089; *cf. Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. Moreover, Robinson points to evidence that was actually more qualified than Stein, in that he had more job experience at TWI, greater educational credentials, and had helped train Stein. Finally, there is the fact that the promotion of Stein and not Robinson arguably violated TWI's written affirmative action policy requiring that minority candidates be given preference in hiring and promotion over other similarly-qualified candidates. These circumstances further support an inference of discrimination and thus Robinson has succeeded in making out a *prima facie* case.

■ TWI asserts that Hayes had a legitimate, non-discriminatory reason for choosing Stein over Robinson, namely, that Stein was more qualified. The evidence presented by Robinson in making his *prima facie* case, however, is substantial enough to raise a triable issue as to whether TWI's proffered reason is pretextual.

Moreover, the comments by Hayes and the dispute over the Urban League lunch are also relevant here, as they were with the issue of Robinson's demotion, and further assist him in demonstrating that there is a dispute over a material fact, i.e., Hayes's intent.

### IV. *Robinson Has Raised A Factual Dispute Over Whether TWI and Hayes Retaliated Against Him During His Employment With TWI For Complaining That He Was The Victim of Race Discrimination*

Robinson has raised a factual dispute as to whether he was retaliated against prior to the E & Y outsourcing for his informal and formal complaints of discrimination.

Robinson complained about what he believed was racial discrimination on the part of Hayes to Watson, the Human Resources Manager responsible for the Department, on several occasions: after the August 9, 1995 demotion; after the November, 1995 reorganization; and on April 29, 1996, after Robinson had been placed on a "watch list" and given the lowest salary increase and bonus in his career at TWI, and after Hayes had hired a white male under the newly-created title of Senior Manager. Robinson also followed up his April 29 complaint with Watson on April 30, 1996, by complaining to Watson's supervisor, Priscilla Bijur. Finally, on January 19, 1997, Robinson filed charges with the EEOC.

In order to make out a *prima facie* case of retaliation, as explained above, Robinson must show that: he was engaged in a protected activity; his employer was aware of his activity; he was subject to an adverse employment action; and there was a causal connection between his protected activity and the adverse action. *See Tomka*, 66 F.3d at 1308.

■ Protected activity includes participation in a Title VII investigation and proceeding as well as opposition to an employment practice that is unlawful under Title II. *See* 42 U.S.C. § 2000e–3(a); *Sum-*

*ner*, 899 F.2d at 208–09. Informal as well as formal complaints, including complaints to management, constitute protected oppositional activity. *See Sumner*, 899 F.2d at 209. Robinson has satisfied the first two prongs of his *prima facie* case by showing that he made both internal complaints to the TWI Human Resources Department as well as, ultimately, a formal complaint to the EEOC, and thus engaged in protected activity that was known to his employer. He has further stated that he acted in good faith, and the circumstances do not contravene that assertion.

■ In order to be actionable, the retaliatory conduct alleged must consist of an adverse employment action. Robinson alleges that, beginning with his first complaint about Hayes after the August 1995 demotion, and continuing throughout the remainder of his employment with TWI, he was subjected to a number of retaliatory actions, including: in the November 1995 organization he was passed over for a promotion and saw a further reduction in his prior authorities, duties, and responsibilities; in January 1996 he received a poor performance evaluation for 1995 and the lowest salary increase and bonus he had ever received; on or about February 1996 he was denied stock options for 1996; on May 11, 1996, he was instructed to provide his immediate supervisor Burkert with a detailed accounting of his whereabouts for a six-month period spanning between 1995 and 1996; on December 10, 1996, he was placed on oral warning; on January 7, 1997, Hayes prepared a memo stating that Robinson had been rated a "C—" performer by Robinson's then supervisor, Bressler; also in January, 1997, he was denied a bonus for 1996 and received only a token salary increase of one thousand dollars; and on February 28, 1997, he was given a written performance warning advising him that he would be fired if he did not improve in four generally subjective areas.

Courts have recognized a broad range of employer conduct as "arguably al-

ter[ing] the terms and conditions of employment in a negative way" and therefore being actionable. *de la Cruz*, 82 F.3d at 21 (transfer to less prestigious unit); *see also, e.g., Harrison v. Metropolitan Gov't*, 80 F.3d 1107, 1119 (6th Cir.1996) (threatening comments and excessive scrutiny of performance); *Tomka*, 66 F.3d at 1308 (termination of salary and benefits). As described above, Robinson has listed a number of acts which rise to the level required by Title VII, especially when considered in combination.[2] Thus, Robinson has made sufficient allegations to satisfy the third prong of the *prima facie* test.

 With respect to the fourth prong, causation, the temporal relationship between Robinson's protected activities and the adverse employment actions supports a *prima facie* case. *See Tomka*, 66 F.3d at 1308 (citations omitted) (inference of discrimination where protected activity followed closely by adverse action); *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986). Here, the record shows that within weeks or months of each complaint, Robinson suffered arguably adverse actions, and that this pattern continued throughout the period of his complaints and until he left work on disability leave. Indeed, Robinson can point to specific instances in which an adverse action followed a complaint in short order, such as the two week lapse between his complaint in April 29 and the May 11 directive from Burkert ordering him to account for his whereabouts over a six-month period.

Moreover, in addition to temporal proximity, Robinson has offered other evidence that the adverse employment actions were triggered by his complaints. For example, he submits that he was treated differently from similarly-situated employees in the November 1995 reorganization, which was subsequent to his complaint about the August 1996 demotion, when only he and the other nonwhite males saw their authority, duties, responsibilities, and compensation reduced. *See Sumner*, 899 F.2d at 209–10. As with Robinson's discrimination claim, these facts assist Robinson in meeting his burden to demonstrate a prima case of retaliation.

 By way of rebuttal, TWI and Hayes assert that there were legitimate business reasons behind each type of allegedly retaliatory action. In each case, however, Robinson has offered sufficient evidence to raise a triable issue as to whether the asserted reasons are pretextual. With respect to the November 1995 reorganization and its impact on Robinson, TWI and Hayes contend, as discussed above, that this was pursuant to a legitimate business need to make the Department more efficient. That argument fails here for the same reasons that it did with respect to Robinson's discrimination claim.

With respect to the negative performance evaluations and reductions in Rob-

---

**2.** In his pleadings, Robinson focuses specifically on the December 10, 1996 oral warning and threat of termination. As discussed below, Robinson has not raised a triable issue with respect to the ultimate loss of his position at TWI because he cannot show interference with the E & Y hiring process. Thus, if the retaliatory nature of the oral warning and threat of termination were to hinge on whether the threat was carried out, there might be a question as to whether Robinson could sustain a cause of action for retaliation. Courts within this Circuit have disagreed as to whether a negative performance evaluation standing alone can constitute an adverse employment action. *Compare Lynk v. Henderson*, No. 98 Civ.2086 2000 WL 178859, at *3 (Feb. 15, 2000) (warning letter considered adverse employment action) *with Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 283 (S.D.N.Y.1999) (negative evaluations without accompanying adverse result not cognizable); *see also Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 443–44 (2d Cir.1999) (affirming District Court's rejection of plaintiff's evaluation-based retaliation claim for lack of evidence, but not addressing issue of claim's cognizability as such). That issue need not be decided here, however, as the December 10, 1996 oral warning does not stand alone, but instead was both preceded and followed by other forms of adverse action with which it was connected.

inson's salary increases, bonuses, and stock compensation, they allege that these changes were justified by Robinson's poor performance. Robinson has raised sufficient questions as to the motivations of Hayes and others that he reported to in the Department to create a triable issue of fact here. The same is true for the issue of whether he received undue increased scrutiny with respect to his work.

TWI and Hayes also allege that, in the case of stock compensation, Robinson was treated no differently than any other Manager after the November 1995 reorganization. The fact that Managers hired after November 1995 did not receive stock options—and indeed, the new Senior Manager did receive them—does not diminish the fact that Robinson saw his own compensation reduced not only in this regard but in others as well.

Finally, TWI and Hayes do not substantially respond to Robinson's allegations that he was subject to increased and discriminatory scrutiny as to his work. In sum, Robinson has presented sufficient evidence to establish a material issue as to whether the asserted reasons for the adverse actions taken against him are pretextual.

### V. Robinson Has Not Presented A Triable Issue With Respect To Interference By TWI In the E & Y Hiring Decision

Robinson alleges that TWI and Hayes interfered with the E & Y hiring process, and that this interference constituted both racially discriminatory conduct and retaliation against him for having filed a charge with the EEOC and the complaint in this action. His retaliation claim will be discussed first, but much of the analysis will apply to his discrimination claim as well.

Robinson has met the first and second prongs of the *McDonnell* test, as it is undisputed that prior to the E & Y decision not to hire him he engaged in protect-

ed activity—informal and formal complaints of discrimination, including an EEOC charge—that was known to his employer, TWI. Robinson asserts that the third prong of the test is met because he was not hired by E & Y. For purposes of this discussion, the Court will adopt Robinson's position on this point, and will focus on the issue of causation, which is where the trouble with Robinson's case really lies.[3]

Robinson's claim that TWI retaliated against him by interfering with the E & Y process becomes tenuous when the issue of causation is considered. Robinson alleges that E & Y failed to hire him due to interference with the E & Y hiring process, "in all likelihood ... by way of private conversations between Hayes of TWI and Peter Howe of E & Y". While Robinson may cite to "direct, statistical or circumstantial evidence" in making his *prima facie* case, *see Gallo*, 22 F.3d at 1225, he cannot rely on merely conclusory allegations, *see National Union Fire Ins. Co.*, 708 F.Supp. at 1379.

Robinson concedes that he has no direct evidence of interference, but argues that there is circumstantial evidence—primarily in the form of statistics—giving rise to an inference of discrimination. According to Robinson, his "best evidence" is the fact that both he and Jill Korn, another Department employee who had filed charges with the EEOC alleging discrimination (disability-based) by Hayes, were not hired by E & Y. There were four people out of a total of thirty three employees interviewed were not offered positions with E & Y. Two of them, Kramer and Danziger, had previously worked for E & Y and had been terminated or rated as poor performers while there. The other two were Robinson and Korn. Robinson submitted an expert's report analyzing this information and urges that based on that analysis, there is an "almost nil statistical probability" that

---

**3.** Alternatively, the adverse employment action could be characterized as the alleged interference by TWI and Hayes. The result of the analysis is the same, however, because in either case Robinson fails to raise an issue of triable fact with respect to causation.

it was a coincidence that he and Korn were rejected.

██ Statistics are an acceptable form of circumstantial evidence in a Title VII case. The evidence presented by Robinson, however, cannot as a matter of law give rise to the series of inferences that would be necessary to establish causation. Inferences must be drawn not just with respect to TWI or Hayes' behavior, but also and more critically with respect to the behavior of E & Y. That is, in order to be probative, the fact that Robinson and Korn were not hired would have to give rise to (1) an inference that E & Y knew that Robinson and Korn had filed charges with the EEOC, (2) an inference that if E & Y knew it was because someone at TWI told them, and (3) an inference that E & Y based their hiring decision on this knowledge. In and of itself, however, this statistic cannot give rise to such inferences, as there are simply too many gaps in the chain of causation—gaps which could be filled by little more than speculation and assumptions about E & Y's knowledge and motivation.

Moreover, assuming *arguendo* that the failure to hire Robinson and Korn satisfied the *de minimis* requirements for making a *prima facie* case, ultimately Robinson cannot meet his burden of persuasion due to the substantial evidence offered by way of rebuttal. Every witness questioned on the subject, including those from E & Y, testified that as a matter of both corporate policy and fact E & Y did not want and did not solicit performance evaluations from anyone at TWO. Howe had lunched with Hayes prior to the interviews, but Howe testified that he did not discuss Robinson with Hayes or any other TWI employee or former employee. Nor does the record contain evidence that E & Y was aware that Robinson and Korn had filed EEOC charges. Robinson's statistic cannot with-stand the force of this uniformly consistent direct evidence offered to show that E & Y's process was not tainted by TWI.

██ Robinson also alleges that TWI and Hayes had the motive and opportunity to influence E & Y not to hire Robinson, and that these facts support his case. With respect to the issue of motivation, Robinson points to no evidence other than his own conclusory allegations in his affidavit and the amended complaint.[4] Moreover, even assuming retaliatory motive on the part of TWI and Hayes, there is no evidence in the record from which a reasonable jury could conclude that they actually did so. "[E]vidence of an opportunity to influence does not amount to evidence of actual influence," and that is the critical question here. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1321 (10th Cir. 1999); *see also Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 109 (2d Cir.1997); *Meiri,* 759 F.2d at 998.

██ With respect to E & Y's motivations, which Robinson also asserts support his case, the record shows only that the TWI account was worth a substantial sum of money. Absent any other evidence, the leap between this fact and the inference that E & Y would have been motivated to participate in illegal retaliatory action against Robinson is too great.

██ Finally, Robinson points to what he alleges are discrepancies and inconsistencies in the E & Y hiring process as evidence that it had to have been contaminated by TWI. For example, he asserts that there are inconsistencies between the interview Evaluation Forms completed by Carrie and Howe and the reasons set forth by E & Y for not hiring him in the notes of their August 1 meeting, as well as in their testimony in this case. He also asserts that some of the TWI employees who were offered jobs with E & Y received lower ratings than he did in their interview Eval-

---

4. While this Court has already determined that Robinson has raised a triable issue of fact with respect to whether certain prior actions taken by the defendants, such as their demotion of Robinson, were motivated by racial discrimination, the E & Y process involves allegations of distinct discriminatory and retaliatory conduct. Therefore, Robinson cannot rely on evidence pertaining to the defendants' conduct in those past episodes.

uation Forms, and that the person who was given the position that he previously held had no experience in the relevant field, whereas he had significant experience.

Under the circumstances of this case, however, there is a fundamental difficulty with this type of evidence, as there was with Robinson's statistical evidence. Here again, the factfinder would be required to make a series of inferences which do not follow from one another. That is, one would have to infer that the presence of inconsistencies of this nature in the E & Y process means not that there were differences among E & Y personnel and that some of them may have changed their thinking, for reasons that are unknown but cannot be presumed to be discriminatory. One would also have to infer specifically that TWI or Hayes acted so as to influence E & Y and that E & Y acquiesced therein. The type of evidence offered by Robinson may indeed support an inference of discrimination in the typical Title VII case, where the alleged inconsistencies and contradictions are on the part of the plaintiff's employer, *see Shelborne v. Runyon*, No. Civ. A. 95–0641(RMU), 1997 WL 527352, at *8 (D.D.C. Aug. 21, 1997). Here, however, the chain of reasoning is simply too attenuated. It is as likely as not that E & Y acted for its own reasons, even if without complete consistency, as that it acted at the urging of TWI and specifically with a discriminatory or retaliatory intent.[5]

None of this is to say that a plaintiff could never establish the causal link necessary for a claim of retaliation where the adverse action is taken by someone other than the employer itself. *Cf. Johnson v. Palma*, 931 F.2d 203, 208 (2d. Cir.1991)

(finding prima facie case of retaliation by employee's union where union acquiesced in employer's discriminatory policy). But Robinson cannot establish that link here.[6]

As for the claim that TWI interfered with the E & Y process out of discriminatory intent, rather than a retaliatory one, the same difficulties outlined above preclude such a claim. Although there is no distinct "causation" element required to make out a *prima facie* case of discrimination, as there is with retaliation, the plaintiff must show that the circumstances give rise to an inference of discrimination. In this case, causation becomes a critical issue because Robinson must show that E & Y's hiring process was interfered with by TWI in order to show that TWI acted with discriminatory intent so as to harm Robinson. Without being able to demonstrate causation, Robinson can raise no triable issue as to whether the circumstances give rise to an inference of discrimination.

■ Finally, Robinson's claim for tortious interference with prospective advantage suffers from the same evidentiary problems, which is that there is no triable issue of fact as to whether TWI and Hayes intentionally caused E & Y not to enter into a contractual relationship with him. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d. Cir.1995); *see also Goldhirsh Group*, 107 F.3d at 109. Robinson's circumstantial evidence is inconclusive, and there is substantial direct evidence to the contrary.

## VI. *An At Will Employee May Assert Section 1981 Claims*

The issue of the viability of the claim of an at will employee for discrimination under 42 U.S.C. § 1981 has been the subject

---

5. The same applies to Robinson's argument that because Howe's comments on his interview Evaluation Form were similar to comments made by Hayes about Robinson's performance, that indicated tampering. It is just as likely that the similarity indicated two independent evaluations.

6. It should be noted that the discrepancies to which Robinson points are also not of a suffi-

cient magnitude to give rise to an inference of taint, especially in the face of the testimonial evidence offered by TWI and Hayes that there was no such contamination. It must be remembered that where the defendant in a Title VII case articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must show more than that the reason is not credible, but must show that the real reason is discrimination. *See Tomka*, 66 F.3d at 1308.

of authority at the district court level. For the reasons set forth in *Equal Employment Opportunity Commission v. Die Fliedermaus, L.L.C.*, 77 F.Supp.2d 460, 469–70 (S.D.N.Y.1999), this Court has held that such claims are proper.

## VII. Statute of Limitations

### A. Claims Under Title VII

#### 1. Events from April 1995 and After

■■■■ Under Title VII, a plaintiff must file a complaint with the EEOC within 300 days of the claim's accrual, which occurs when the "'plaintiff knows or has reason to know of the injury which is the basis of his action'". *Cornwell v. Robinson*, 23 F.3d 694, 703–04 (2d Cir.1994) (citations omitted); *see also* 42 U.S.C. § 2000e–5(e).[7] If he fails to meet this statute of limitations, his claim will not be actionable in federal court. *See Cornwell*, 23 F.3d at 703–04.

■■■■ There is a continuing-violation exception to the statute of limitations, which "'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the state of limitations.'" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (citations omitted). A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell*, 23 F.3d at 704.

■■ The record shows that, with respect to the period between April 1995, when Hayes became Vice President of the Department, and 1997, the multiple instances of discriminatory and retaliatory conduct should be considered both ongoing and related. This is not a case where Robinson merely continued to feel the effects of a time-barred discriminatory act. *Cf. Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir.1999). Robinson's grounds for meeting the continuing-violation exception are further supported by the fact that Robinson complained repeatedly about this conduct, yet it was left unremedied by TWI. *See Zerilli v. New York City Transit Authority*, 973 F.Supp. 311, 320 (E.D.N.Y.1997).

#### 2. Events Before April 1995

■■ The continuing violation exception does not apply, however, to Robinson's claims of discrimination for the period before April 1995, because the record shows that Robinson was not subjected to an ongoing and consistent policy of adverse conduct by TWI during that time. On the contrary, as he himself points out, he received one promotion (from Audit Supervisor to Audit Manager), as well as merit increases, stock-option awards, and performance-based bonuses. Although Robinson contends that he was denied promotions based on race discrimination during the period in which he worked under Thomas and then LaBarca, under the circumstances he cannot be said to have been subjected to ongoing discriminatory conduct which was continuous with the discrimination he alleges to have suffered at the hands of Hayes.[8]

---

7. The time within which an EEOC claim must be filed is always either 180 or 300 days after accrual of the claim, depending on whether there is a state or local equal employment agency. *See* 42 U.S.C. § 2000e–5(e); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712–13 (2d Cir.1996). Where such an agency exists, as in New York, the plaintiff is to file a charge with that agency first, and then the 300 day rule applies. *See Van Zant*, 80 F.3d at 712. The record is unclear as to whether Robinson filed a charge with the relevant New York agency before filing with the EEOC. However, this fact will be considered stipulated as the parties agree that the 300-day period applies. *See Van Zant*, 80 F.3d at 713 n. 1.

8. Indeed, the combination of Robinson's allegations of discrimination in failing to promote him with his assertions that he was perceived as a good employee by Thomas and LaBarca, and rewarded as such, render his claims for that period nonviable on substantive grounds as well. Given the evidence in the record, it is doubtful whether a reasonable jury could

338

## B. Claims Under section 1981 and the NYHRL

The statute of limitations under both section 1981 and the NYHRL is three years. Robinson's post-April 1995 claims fall within this statute of limitations, as he filed his first complaint in this action on July 11, 1997.

## VIII. Punitive Damages

 TWI contends that Robinson's demand for punitive damages under Title VII and Section 1981 should be dismissed because Robinson's evidence could not as a matter of law satisfy the standard for obtaining such damages, i.e., that the defendant acted with malice or with reckless indifference to the federally protected rights of the aggrieved individual. *See* § 42 U.S.C. § 1981a(b)(1); 42 U.S.C. § 2000e *et seq.; Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). On the present record, however, it cannot be said that Robinson has not raised a triable issue of fact as to whether the defendants acted with the requisite evil motive or intent with respect to those claims that have survived summary judgment.[9]

## Conclusion

For the reasons stated herein, the motion for summary judgment is therefore granted in part and denied in part.

The pretrial order will be filed on July 5, 2000, and a pretrial conference held on September 6, 2000.

It is so ordered.

---

find that Robinson had made out a claim for discrimination based on that earlier period.

**9.** The Court notes that neither party briefed this issue fully. Therefore, leave is hereby granted to renew this motion prior to trial.